KIEVE LAW OFFICES
  Loren Kieve (Bar No. 56280)
  lk@kievelaw.com
5A Funston Avenue
The Presidio of San Francisco
San Francisco, California  94129-1110
Telephone:      (415) 364-0060
Facsimile:      (435) 304-0060

FOX ROTHSCHILD LLP
  Michael A. Sweet (Bar No. 184345)
  msweet@foxrothschild.com
  Dale L. Bratton (Bar No. 124328)
  dbratton@foxrothschild.com
235 Pine Street, 15th Floor
San Francisco, California 94104
Telephone:      (415) 364-5540
Facsimile:      (415) 391-4436

Counsel for plaintiff E. Lynn Schoenmann,
Trustee of the Bankruptcy Estate of
Synergy Acceptance Corporation

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>SYNERGY ACCEPTANCE CORPORATION,<br><br>        Debtor.<br><br>───────────────────────────<br><br>E. LYNN SCHOENMANN, Trustee of the Bankruptcy Estate of Synergy Acceptance Corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>JAMES A. TORCHIA. et al.,<br><br>        Defendants. | Adversary Proceeding No.: 12-03156 HLB<br><br>Bankruptcy Case No. 11-31712-HLB<br><br>DECLARATION OF JAY D. CROM (a) IN SUPPORT OF THE TRUSTEE'S OBJECTIONS TO AND MOTION TO STRIKE THE KRUSE, MORGAN AND HART DECLARATIONS AND (b) IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE CROM EXPERT DECLARATION AND TESTIMONY<br><br>Date:  May 8, 2014<br>Time:  10:00 a.m. |

Jay D. Crom declares:

1. I have been retained by the Trustee as her accountant to examine the books and records of the debtor, Synergy Acceptance Corporation ("SAC").

2. I am a Certified Public Accountant, a Certified Insolvency and Restructuring Advisor and a Certified Fraud Examiner. My resume is attached (**Exhibit A**)

3. I have performed investigative and accounting services, including financial investigations relating to bankruptcy proceedings for more than thirty years.

4. My examination of SAC's books and records and other documents that I have reviewed in connection with this matter reflects the following:

5. I have read the defendants' motion to strike declaration of Jay D. Crom and related exhibits and the related declarations of James A. Torchia, Kimberly Kruse (SAC's former chief financial officer), Richard L. Morgan (Founder, CFAM Financial Services, LLC) and James F. Hart, CPA.

**A. Morgan's flawed opinion is based on Kruse's equally flawed conjecture:**

6. Morgan opines that the value of SAC's loan network and volume/profit levels in 2007 is $17 million, with a range in value of $14 to $20 million

7. His opinion is based on a flawed and illusory concept that SAC's loan pools were generating **monthly net profits** approximating $600,000. There is no evidence that SAC ever generated any significant net profits.

8. For his view of these numbers, Morgan relies on Kruse's declaration and her even more flawed computation of profits.

**Kruse's 2006 numbers are fiction:**

9. Kruse computes a "total profit for 2006" of $2,912,145.69, or a profit of $1,503.43 per loan on 1,937 loans (from Exhibit 7 at MSJ Appendix page 88). This is a complete fiction.

**B. SAC's actual audited financial statements show a 2006 net loss of $686,491:**

2

10. Kruse bases her conclusions on a recently prepared spreadsheet based on unknown and previously undisclosed documents.

11. **SAC's audited 2006 SAC financial statements** were audited by a CPA firm that gave a clean opinion on March 30 2007 (but for the fact that SAC's financials were not consolidated with related party companies). By any standard, they are much more reliable evidence of SAC's results of operations than the spreadsheet of questionable origin Kruse recently compiled for this case.

12. SAC's **audited financial statement** for 2006 – the best indicator of SAC's actual financial performance – reflects an **actual net loss** of $686,491 (**Exhibit B**).

13. Kruse computes 2006 average monthly profits for 2006 of about $242,000. The **audited financial statement**, however, shows a **loss** that averages about $57,000 per month during 2006. Kruse recently testified that these loan summaries were not prepared in connection with the price paid for SAC but rather were prepared to show the volume and revenue generated every month (**Exhibit F** "page 160"). Kruse also testified that she had no knowledge of how the SAC purchase price was determined (**Exhibit F** "pages 94 & 160").

**C. Kruse ignores SAC's operating costs:**

14. Kruse ignores SAC's operating costs. SAC's business, as is illustrated by James Torchia's declaration, required a large workforce and the development and maintenance of a wide network of contacts (**Exhibit E** "pages 82-84". SAC's business required massive operating costs that exceeded its profits from loan sales.

15. Additionally, Kruse computes a total 2006 "profit" of $2.9 million. SAC's 2006 audited financial statement shows a **gross profit before operating expenses** of $2,117,130. According to Kruse, SAC therefore made $800,000 more than is reflected in the audited financial statement, but ignores operating expenses entirely.

**D. Kruse's 2007 numbers are totally fictitious:**

3

16. For 2007, Kruse states that 2,597 loans were sold in the first six months of 2007. She then applies an illusory $1,503.43 profit per loan by pulling it out of thin air from her 2006 compilation to arrive at total profit of $3,904,407 for the first six months of 2007. Because the 2006 "profit per loan" is a fiction, the application of this number to arrive at 2007 "profit per loan" is even more of a fiction.

17. Kruse offers no 2007 financial statements that support this profit computation.

**E. SAC's 2007 income tax return shows an $833,927 loss on sales:**

18. SAC's 2007 corporate income tax return reports a **loss** of $833,927 on sales of $39.8 million.

**F. SAC's financial records show a $5.06 million loss for the first half of 2007:**

19. I generated a Profit & Loss Statement for the six months ended June 30, 2007 from SAC's QuickBooks database (**Exhibit D1-4**). It shows a **loss** of $5.06 million.

20. Even this number understates the net operating costs. While it includes $5.3 million of related-party receivable write-offs, it does not include a $124,000 loan loss provision that was posted directly to retained earnings and appears to significantly understate accounts payable at only $15,807, where **accounts payable** were $823,463 at December 31, 2006. Contrary to Kruse's artificial, unsupported conclusion that SAC's operations were profitable during the first half of 2007, SAC's actual financial records show that they generated a large loss.

**G. There are no supporting bank account records or income tax returns:**

21. There is no indication that SAC's bank accounts reflect or support Kruse's $6.8 million in profits during the 18 month period through the stock redemption date. Nor are any such profits reported on SAC's income tax returns, submitted under penalty of perjury. SAC reported tax losses to the IRS in both 2006 and 2007.

**H. The Kruse declaration should be stricken:**

22. Kruse's declaration should therefore be stricken as without factual support and contrary to the documents and facts of record.

**I.   The Morgan and Hart declarations are based on Kruse's fictional numbers:**

23. The numbers and opinions in the Morgan declaration are based on Kruse's fictional numbers.  It too should be stricken as without any evidentiary or factual support.

24. Hart's declaration, in turn, relies on Morgan's.  Because Morgan's declaration is without foundation, so is Hart's, which also should be stricken.

25. All the defendants' "numbers" are built on flawed premises that (a) large profits were generated by the loan sales to APAL and (b) that loan sales would continue at the same or a greater rate in future years. There were no profits and SAC's primary customer American Pegasus Loan Fund ("APAL") did not have the resources to continue buying a large volume of loans for more than a few months beyond the stock redemption date.

**J.   Morgan's declaration is flawed for other reasons:**

26. Morgan makes various industry comments and makes broad statements on SAC's loan purchase discounts, loan costs, and other items.  Morgan states he was provided with summaries of loans sold in 2005, 2006 and 2007 as well as the backup details for the loans sold contained in those summaries.  He concludes that SAC was generating 500 loans per month with $40 million of annual volume that generated returns 'capable of exceeding 40% annually.  Because these numbers are based on Kruse's, they have no evidentiary support.  (Even if this were true, such a high level of profits is not sustainable as SAC did not have any patents or unique business processes and would be subject to intense competition.)

27. Morgan's concedes his valuation is not supported. He disclaims, "*Data supplied was limited.  Detail financial statements were not reviewed for the 2005-2007 timeframe relating to the timing of Synergy Acceptance's sale.*"

28. He opines, however, that "*The price paid for Synergy Acceptance was based upon the value of its "C-quality" auto loan origination network.  Using the information supplied relating to Synergy Acceptance loan value and quality, Synergy Acceptance was generating loan pools each month whose profits' approximated $600,000 over 38-40*

*months.*" As noted above, there is no evidence to support a monthly profit of $600,000 at any time, much less over 38-40 months.

29. Morgan goes on to value the loan volume and related profit stream at 2 to 3 times annual profits or about $17 million with a range of $14 to $20 million Morgan seemingly arrives at a value of $17 million by assuming $600,000 per month in profits and valuing those monthly profits by multiplying them by a factor of about 2 to 3 times annual profits. As demonstrated above, Morgan's conclusion of value is entirely based on the faulty assumption that SAC was generating $600,000 in monthly profits at the time of the stock redemption, which all the meaningful evidence shows is simply not so.

30. Morgan did not make any evaluation of SAC's actual business operations. Applying Morgan's formula to SAC's actual profits, which were non-existent according to the 2006 audited financial statements, would lead to a zero value for these business operations.

**K. Hart's declaration is equally flawed:**

31. Hart notes that SAC's audited 2006 financial statement reports a net loss of $686,491 on sales of $19 million. The audited financial statement is comprehensive and conclusively shows that SAC had no profit in 2006, contradicting Kruse's notional profit calculation of over $2.9 million. SAC may have reported a 2006 gross profit of $2,117,130, but its operating costs were $2,803,621, reflecting a net loss of some $700,000. The 2006 audited income statement shows that SAC incurred GPS Units, Warranty and other costs of sales that further reduced gross profit by nearly $800,000.

32. Hart fails to identify and address the obvious omission of operating costs by Kruse in determining "profits" despite his review of the 2005 and 2006 audited financial statements. Hart also makes no effort to reconcile the 2006 audited financial statement loss with Kruse's 2006 total profit conclusion.

33. Hart identifies "positive cash flow" from operations of $1.5 million in 2006, but fails to disclose that this was the result of a one-time event: SAC's auto loans receivable were sold off reducing the book value of the auto loans receivable assets from $4,478,104 (current and non-current) at 12/31/2005 to only $936,591 at 12/31/2006.

34. It is more than obvious that this $3.5 million source of "positive cash flow" was in fact a massive inventory liquidation, one that could not be repeated and without that source, it would have had a cash flow deficit in 2005 of over $2 million. Hart fails to identify the obvious inconsistency of this $2 million cash flow deficit with the Kruse's illusory "total profit" of $2.9 million.

**L. There is no "going concern" value:**

35. Without any evidence of net profits, there is no basis for computing going concern value based on profits. With little or no value allocable to intangibles, there can be no real debate about whether SAC was rendered insolvent by the more than $20 million in debt that was hoisted upon it under the terms of the June 2007 agreement.

36. Hart and Morgan acknowledge that SAC did not have substantial tangible assets. They also seem to acknowledge there are no comprehensive 2007 financial statements for this business that they value at over $20 million.

**M. The $19 million "sale" of SAC had no supporting financial documents:**

37. I have never seen an instance of a complex business process sale occurring for such a large price without significant due diligence including documentation of, and reliance on, extensive comprehensive financial records relating to the entirety of assets, debts and operations.

**N. Morgan ignores business risk:**

38. Morgan's valuation also fails to address the concentration of business risk inherent in SAC's customer relationship with APAL. APAL acquired roughly 94% of all loans sold by SAC in 2006 and over 98% of all loans sold in 2007 through June 30. Neither Hart nor Morgan address the fact that APAL was by far SAC's largest customer for

acquiring loans during the 2006 and pre-redemption 2007 time period, and that APAL would spend all its cash by the end of 2007. Measuring SAC's net profits and future cash flow potential based on these loan sales to APAL is both illogical and not supported by any acceptable financial analysis.

**O. SAC could not sustain a high level of loan acquisitions**

39. As can be seen from Kruse's own exhibits, in 2006 and 2007 respectively, only $1.324 million and $403,000 in SAC's loans were sold to other parties. APAL's inability to continue a high level of loan acquisition is illustrated in APAL's 2008 financial statement, at footnote 7 regarding related party transactions, which reports loan origination fees earned by SAC of $812,944 in 2007 and only $208,938 in 2008 (**Exhibit C**).

40. This note also shows APAL's prepaid fee asset of $5,187,056 due from SAC at December 31, 2007 and that after July 2, 2007 SAC was earning a reduced fee of 4.05%, a 10% reduction from the prior 4.5% rate as a result of the $6 million prepayment made to SAC within days of the stock redemption.

41. In my opinion, APAL's 2007 and 2008 financials also did not record adequate reserves because most of its loan portfolio deteriorated from "auto loans" to residual balances on defaulted loans whose value eventually dissolved to pennies on the dollar. APAL was eventually put into receivership. All these factors heavily weigh on SAC's prospects for generating loan sale fees and net income after all expenses, subsequent to the June 2007 stock redemption date.

**P. Hart's criticisms are meritless:**

42. Because of what I consider to be an obvious massive insolvent position created by the stock redemption and the obvious lack of any consideration beyond worthless treasury stock, I did not see a need to address (a) the value of the insignificant intangibles, (b) comparable company sales and (c) premise of value.

43. Hart opines that I should apply generally accepted valuation approaches and methodologies such as the market approach, income approach or asset approach. My approach is an asset approach and is an evaluation of SAC's assets at fair market value. SAC's debts are valued at the amounts I determined it was liable for based on available documents – primarily those recorded on SAC's financial statements.

44. Because SAC was not profitable and relied on APAL for loan sales, and APAL's ability to purchase loans was ending as it ran out of cash, there was no income stream to value – and thus the income approach valuation model produces a zero value. The market approach is not applicable because SAC's loan sales volume was heavily reliant on related-party transactions and was not sustainable. Therefore no comparable sales exist because no one would purchase a poorly-documented, money-losing operation that was dependent on a single customer that was running out of money.

45. There was another redemption of SAC's stock that occurred shortly before this redemption. An e-mail dated 5/23/2007 from Marc Celello suggests that Rob Smith will be paid $20 per share for his 600 shares or $12,000 total (**Exhibit G**, page 2 / bates #D005902). The 2006 audited financial statements show that Robert Smith's 600 shares represented 30% of the company as of 12/31/2006 (**Exhibit B**, page 10) and on March 27, 2014 Torchia testified that Smith had owned 30% (**Exhibit E** "page 116"). Thus, it appears that Rob Smith was bought out for only $12,000 in 2007, suggesting a negligible valuation of SAC taken as a whole. Despite this, in justifying the $25 million price that Torchia told Ben Chui he should pay for SAC and the repair shop, Torchia testified that Smith told him "…the company is worth way more than the original 12 million that I had mentioned." (**Exhibit E** "page 116") Torchia testified that Smith was his partner and that Smith had been given shares sometime after formation of SAC (**Exhibit E** "page 14"). Kruse testified that Smith performed underwriting services for SAC (**Exhibit F** "page 60").

46. I also did not prepare a 'death bed' liquidation analysis as that was not necessary. Write-offs of various related party receivables net of related party debt totaled $2.4 million. This left $3.185 million in assets held by SAC based on the December 2006 audited financials. Total liabilities were $8,034,278 per the audited balance sheet or $6,225,884 after elimination of related party loans. It is my opinion that the remaining assets were worth roughly their carrying value. The remaining assets were primarily comprised of cash, recently acquired accounts and loans receivables. The building that appeared to have been acquired in November 2005 from National Viatical according to the 2006 income tax return for $728,015 (building at $473,015 plus land at $255,000), and carried at a value of about $700,000 at December 31, 2006, was removed from the books as part of the sale transaction (**Exhibit D9**). Thus, before the redemption, SAC had over $3.7 million of debts in excess of assets based on this analysis. The $19 million in debt incurred and debt forgiveness transactions as a result of the SAC stock redemption agreement yields an obvious result of massive insolvency of over $22.7 million (**Exhibit D3**).

47. Hart appears to claim SAC's solvency position is not impaired by its $19 million obligation under the stock redemption transaction because SAC, under the amended agreement of 10/15/2007, would have an offsetting receivable from Synergy Equity (Hart paragraph 24E). This conclusion is contradicted by his analysis in his preceding paragraph 24D where he discusses the valuation discount necessary for substantial risks and costs of collection. I have seen no indication that Synergy Equity had any substantial assets other than those funneled to it via APAL and of course Synergy Equity has never actually made repayment of any amounts to either SAC or APAL. The impropriety of this assertion is obvious when the grossly inflated price of the stock is assessed in combination with Synergy Equity's lack of substance. After the stock redemption, the debtor, SAC, is left standing alone with few valuable assets and massive debt due to APAL

48. Any recovery rights SAC had against Synergy Equity were of little or no value. More importantly, the October amendment has no impact on the obligations that were created by the June 30, 2007 redemption agreement for purposes of a June 2007 test date.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: April 17, 2014

/s/ Jay D. Crom
Jay D. Crom

Exhibit A



**BACHECKI, CROM & CO., LLP**
Consultants and Certified Public Accountants
180 Montgomery Street, Suite 2340
San Francisco, CA 94104
**www.bachcrom.com**

Gerald W. Bachecki
Jay D. Crom
Kimberly J. Lam

Robert A. Block (1944-1992)

Tel. (415) 398-3534
Fax (415) 788-0855
bachcrom@bachcrom.com

## JAY D. CROM, CPA, ABV, CIRA, CFE
*Summary of certification, education and experience:*

*Received Certified Public Accountant (CPA) certificate
from the California State Board on January 29, 1982.

*Obtained designation of Certified Insolvency and Restructuring Advisor (CIRA)
from the Association of Insolvency and Restructuring Advisors on October 18, 1995.
*Obtained designation of Certified Fraud Examiner (CFE)
from the Association of Certified Fraud Examiners on April 4, 1997.
*Obtained designation of Accredited in Business Valuation (ABV)
from the American Institute of Certified Public Accountants on April 28, 2005.

*Employed by Bachecki, Crom & Co., CPA's (formerly Gerald W. Bachecki & Co.)
in September, 1980, admitted as a partner in January, 1986, appointed managing partner in
1998.

*Member of the American Institute of Certified Public Accountants,
California Society of Certified Public Accountants, Association
of Insolvency and Restructuring Advisors, California Receiver's Forum, National Association of
Bankruptcy Trustees and the Bay Area Bankruptcy Forum.

*Obtained Bachelor of Science in Business Administration with an
emphasis in accounting from California State University at
Sacramento in January, 1980.
*Attended Post Graduate taxation courses at Golden Gate University
from 1981 through 1983.

*Extensive practice in closely held sole-proprietorship, partnership and corporate valuations,
consulting and financial statement accounting.
*Extensive practice in the areas of bankruptcy taxation, transfers
& insolvency analysis and bankruptcy & receivership accounting since 1983.

*Served as Examiner in Chapter 11 Cases.

*Admitted as an expert in San Francisco, Oakland, San Jose and Santa Rosa Bankruptcy Courts
in the areas of taxation, insolvency, valuation and transfers accounting.

Exhibit A



## JAY D. CROM, CPA, ABV, CIRA, CFE
## Court Appointments and Expert Appearances

**Appointed as Examiner by the U.S. Trustee's office in the following Chapter 11 matters;**
Ming Ze, Inc., 2005, Judge Carlson (San Francisco)
James Lass, 2004, Judge Grube (San Jose)
Douglas Jonathan, 2004, Judge Grube (San Jose)
NeoPhotonics Inc., 2004, Judge Morgan (San Jose)
Cheli & Young Construction, 1999, Judge Jaroslovsky (Santa Rosa)
Credit Service Inc., 1998, Judge Newsome (Oakland)
Samos Greek Restaurant, 1998, Judge Carlson (San Francisco)
Straightline Investments, 1998 Judge Jaroslovsky (Eureka)
Dry Creek Inn, Limited Partnership, 1997, Judge Jaroslovsky (Santa Rosa)
Atrium Publishing, Inc.; 1997, Judge Jaroslovsky (Santa Rosa)

**Listing of All Testimony and Selected Declarations as Expert Witness within the last five years:**
E. Lynn Schoenmann, Trustee of Bankruptcy Estate of UCBH Holdings, Inc. v. FDIC, Corporate and FDIC, Receiver, United States District Court, No. District, San Francisco Div. 3:10-CV-03989-CRB
Deposition regarding fraudulent transfers and income tax refund assets, April 2014
Charles T. Madden et al. v. Cowen & Company, Superior Court California,CGC-06-453608, Deposition re Damages Computations, November 2013
*Client:* Janina Elder Hoskins, Chapter 7 Trustee, Matter: Monette R. Stephens/ Carl Wescott, Debtor, Trial Testimony re: Insolvency, failure to account for and transfer of assets, San Francisco Bankruptcy Court, October 2013
*Client:* Lois Brady, Chapter 7 Trustee, Matter: Tranax, Inc, Debtor v. Hanmega and Hantle Systems: Attend mediation with Judge Dennis Montali as Trustee's accountant regarding insolvency, preferences and fraudulent conveyance issues, April 2013
*Client:* E. Lynn Schoenmann, Chapter 7 Trustee, Matter: Frank Lembi, Debtor, Declaration in support of sale and settlement involving Personality Hotels, LLC addressing insolvency, fraudulent conveyances and valuation of minority interests in Hotel entities, May, 2013
*Client:* John Richardson, Chapter 7 Trustee, Matter: Christina Pham etal. v. ComUnity Lending, Inc., Debtor, U.S. District Court Trial Testimony, San Francisco re: Insolvency, June 2011
*Client:* Hank Spacone, Chapter 11 Liquidating Agent, Matter: Reynen & Bardis, Inc., Debtor, Deposition re: Adequacy of Capitalization, Separateness of Special Purpose Entities, May 2011
*Client:* Timothy Hoffman, Chapter 7 Trustee, Matter: Cascade Acceptance Corporation, Debtor, Declaration re: Insider Financial Transactions, San Francisco Bankruptcy Court, April 2011
*Client:* E. Lynn Schoenmann, Chapter 7 Trustee, Matter: LoriMac, Inc., Debtor, Trial Testimony re: Insolvency and insider transactions, San Francisco Bankruptcy Court, December 2010
*Client:* Janina Elder Hoskins, Chapter 7 Trustee, Matter: Lee-Quon, Debtor, Trial Testimony re: Insolvency, valuation and transfer of life insurance interests, San Francisco Bankruptcy Court, September 2010
*Client:* Lynn Schoenmann, Chapter 7 Trustee, Matter: Bryco, Debtor, Trial Testimony re: Insolvency and capital distributions, San Francisco Bankruptcy Court, May 2010



*Client:* Lynn Schoenmann, Chapter 7 Trustee, Matter: George Q. Chinn, Debtor, Trial Testimony re: Reconstruction and documentation of business loan transactions, Estate's Interest in loan repayments and capital distributions, San Francisco Bankruptcy Court, June 2009

*Client:* Andrea Wirum, Chapter 7 Trustee, Robert & Cathy Mack, Deposition re: CPA standard of care-tax services, March 2009

*Client:* David Kinney, Estate Administrator, Mattei v Kinney, Alameda County Superior Court-Probate Trial: Testimony and Report re Bank and security accounts tracing and identification of funds under control of Kinney, November 2008

*Client:* Tevis T. Thompson, Jr., Chapter 7 Trustee- Rachel Thein, Debtor Discharge Trial Testimony and Report re: Asset tracing and Debtor's sources and uses of funds and asset disposition investigation, October 2008

*Client:* E. Lynn Schoenmann, Chapter 7 Trustee- LoriMac, Inc., Deposition re: Related entity transfers and debtor financial analysis, October 2008

*Client:* Herbert von Rusten, Arbitration: von Rusten v. Bobby Mason, Arbitration Testimony re:partnership accounting, San Francisco, Hon. Raymond Williamson, Jr, AAA, March, 2008

*Client:* Andrea Wirum, Chapter 7 Trustee - Matter: SDR Capital Management Inc. vs. Wilson Trial & Deposition re: Insolvency and Recovery under California Corporate Distribution limitations, San Francisco Bankruptcy Court, October, 2007

*Client:* Phillips, Spallas & Angstadt, Plaintiff- Matter: Phillips etal vs. Shahab Fotouhi, Trial & Deposition re: Law Firm Valuation, Oakland Bankruptcy Court, October, 2007

*Client:* Donald Beck, Plaintiff- Matter: Beck vs. Hoge, Fenton
Trial & Deposition re: Damages, JAMS, San Francisco, CA June, 2007

**Publications:**
**California CPA, June 2005: What You Need to Know About the Bankruptcy Act of 2005**
**NABTalk tax articles, 2007 through 2013**

**Presentations:**
**Bay Area Bankruptcy Forum (BABF) Tax Program April 30, 1996** with Judge Carlson
**AIRA Annual Conference- Bankruptcy Basics 1998, 1999**
**BABF Program Committee, 1995-2003 with Judge Arthur Weissbrodt, Chairman.**
**BABF Tax Program January 22, 2004** with Judge Thomas Carlson, Michael Cooper, Esq., and Kerrie Bercik, Esq., San Francisco, CA
**OUST Trustee Income Tax Program, March 4, 2005, Oakland, Ca**
**AIRA Annual Conference- Annual Tax Programs- 1996 & 2000-2013**
**National Association of Bankruptcy Trustees Annual Conference (NABT)- Tax Program August, 2006, Seattle, WA**
**NABT Conference- Tax Program April, 2008, Santa Fe, NM & Sept. 2010, S.F.**
**CSCPA East Bay Chapter Divorce Mini Conference- Bankruptcy issues, Jan., 2010**
**San Francisco Barrister's Program- Bankruptcy Tax, February 2010**
**Inns of the Court- Tax Program, May 2010, San Jose, CA**

Produced and contributed to various handout materials for the above programs in conjunction with other panel members' contributions.

Exhibit B

**Independent Auditors' Report**

To the Board of Directors
Synergy Acceptance Corp.
Canton, Georgia

We have audited the accompanying balance sheet of Synergy Acceptance Corp. as of December 31, 2006, and 2005, and the related statements of income, retained earnings and cash flows for the years ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

As discussed in Notes 5 and 15 to the financial statements, the Company has financial transactions with several related party companies. In our opinion, accounting principles generally accepted in the United States of America require that the financial statements of these companies be consolidated with those of the Company. The Company has elected not to consolidate these companies.

In our opinion, except for the effects of not consolidating the financial statements of the related parties with those of the Company as referred to above, the financial statements referred to in the first paragraph present fairly, in all material respects, the financial position of Synergy Acceptance Corp. as of December 31, 2006 and 2005, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

Stresser and Associates, P.C.
March 30, 2007

## SYNERGY ACCEPTANCE CORP.
## BALANCE SHEET
### December 31, 2006 and 2005

**ASSETS**

|  | 2006 | 2005 |
|---|---|---|
| **CURRENT ASSETS** |  |  |
| Cash and Cash Equivalents (Note 2) | $ 528,363 | $ 1,049,296 |
| Accounts Receivable (Note 2) | 548,274 | - |
| Prepaid Expenses | 4,029 | 21,970 |
| Inventory (Note 2) | - | 81,729 |
| Current Portion Auto Loans Receivable (Note 2) | 265,148 | 1,150,526 |
| **TOTAL CURRENT ASSETS** | 1,345,814 | 2,303,521 |
|  |  |  |
| **PROPERTY AND EQUIPMENT (Note 2)** |  |  |
| Building | 473,015 | 473,015 |
| Land | 255,000 | 255,000 |
| Building Improvements | 17,650 | - |
| Furniture, Fixtures, and Computer Equipment | 57,886 | 32,262 |
| Software | 8,544 | 7,944 |
| Accumulated Depreciation | (35,271) | (10,233) |
| **NET PROPERTY AND EQUIPMENT** | 776,824 | 757,988 |
|  |  |  |
| **LONG-TERM ASSETS** |  |  |
| Security Deposit | 5,000 | 5,000 |
| Loan Receivable from Related Parties (Note 5) | 4,091,180 | 478,843 |
| Loans Receivable - Other (Note 11) | 376,715 | 42,900 |
| Loans Receivable from Shareholders (Note 12) | 139,230 | 154,230 |
| Interest Receivable on Loans from Shareholders (Note 12) | 8,854 | 5,457 |
| Non-Current Portion of Auto Loans Receivable, net of |  |  |
| allowance of $124,000 (Note 2) | 671,443 | 3,327,578 |
| **TOTAL LONG-TERM ASSETS** | 5,292,422 | 4,014,008 |
|  |  |  |
| **TOTAL ASSETS** | $ 7,415,060 | $ 7,075,517 |

See accompanying notes and independent auditors' report.

2

## SYNERGY ACCEPTANCE CORP.
## BALANCE SHEET
### December 31, 2006 and 2005

**LIABILITIES AND EQUITY**

|  | 2006 | 2005 |
|---|---|---|
| **CURRENT LIABILITIES** | | |
| Accounts Payable | $ 823,463 | $ 640,809 |
| Payroll Liabilities | - | 14,673 |
| Auto Loans Payable (Note 4) | 324,284 | 281,715 |
| Line of Credit (Note 6) | - | 100,510 |
| Current Portion of Unearned Discount (Note 3) | 82,196 | 356,663 |
| Current Portion of Notes Payable (Note 7) | 254,063 | 254,740 |
| Current Portion of Investor Debt (Note 7) | 488,179 | 100,000 |
| Income Tax Provision (Note 10) | 23,636 | 23,636 |
| **TOTAL CURRENT LIABILITIES** | 1,995,821 | 1,772,746 |
| | | |
| **LONG TERM LIABILITIES** | | |
| Related Party Transaction (Note 5) | . 1,808,394 | - |
| Non-Current Portion of Unearned Discount (Note 3) | 246,587 | 1,069,990 |
| Non-Current Portion of Notes Payable (Note 7) | 205,299 | 457,869 |
| Non-Current Portion of Investor Debt (Note 7) | 3,778,177 | 3,707,639 |
| **TOTAL LONG TERM LIABILITIES** | 6,038,457 | 5,235,498 |
| | | |
| **TOTAL LIABILITIES** | 8,034,278 | 7,008,244 |
| | | |
| **EQUITY** | | |
| Common Stock, No Par Value – 1,000,000 Shares Authorized; 2,000 Shares Issued and Outstanding (Note 8) | 100 | 100 |
| Retained Earnings | (619,318) | 67,173 |
| **TOTAL EQUITY** | (619,218) | 67,273 |
| | | |
| **TOTAL LIABILITIES AND EQUITY** | $ 7,415,060 | $ 7,075,517 |

See accompanying notes and independent auditors' report.

3

**SYNERGY ACCEPTANCE CORP.**
**STATEMENT OF INCOME AND RETAINED EARNINGS**
For The Years Ended December 31, 2006 and 2005

|  | 2006 | 2005 |
|---|---|---|
| **REVENUE** | | |
| Interest, Fee, and Discount Income | $ 170,220 | $ 1,665,331 |
| Sales of Loans | 19,091,233 | |
| Other Income | 32,091 | |
| **TOTAL REVENUE** | 19,293,544 | 1,665,331 |
| | | |
| **COST OF SALES** | | |
| Cost of Loans Sold | 16,036,508 | - |
| GPS Units Sold | 469,884 | - |
| Carfax History Report | 15,888 | - |
| GPS Service Fees | 152,164 | - |
| Warranty Expense | 501,970 | - |
| **TOTAL COST OF SALES** | 17,176,414 | - |
| | | |
| **GROSS PROFIT** | 2,117,130 | 1,665,331 |
| | | |
| **EXPENSES** | | |
| Advertising | 27,275 | 1,727 |
| Automobile Expense | 17,951 | 7,680 |
| Bad Debt Expense | - | 110,000 |
| Bank Charges | 5,122 | 19,148 |
| Bonuses and Commissions | 7,501 | - |
| Claim Expense | 11,724 | 6,675 |
| Computer Service | 843 | 6,735 |
| Contract Labor | 62,350 | 337,151 |
| Contributions | 28,750 | 600 |
| Credit Reporting Expense | 34,075 | 697 |
| Depreciation | 25,038 | 7,027 |
| Dues & Subscriptions | 966 | 7,273 |
| Employee Benefits | 16,000 | 4,200 |
| Equipment Lease Expense | 17,415 | 20,656 |
| Insurance | 237,548 | 119,643 |
| Interest Expense | 421,519 | 235,237 |
| Miscellaneous Expense | 5,569 | 6,692 |
| Office Supplies | 32,938 | 9,956 |
| Postage & Delivery | 16,724 | 3,791 |
| Printing & Reproduction | 6,090 | 3,387 |
| Professional Fees | 136,177 | 46,810 |
| Qualified Accounts | 638 | 3,390 |
| Recovery & Repo Expense | 531,115 | 34,873 |
| Rent | - | 50,500 |
| Repairs & Maintenance | 28,016 | 46,706 |
| Salaries | 1,001,398 | 269,322 |
| Taxes - Payroll | 37,739 | 25,417 |
| Taxes, Licenses, & Permits | 12,797 | 2,467 |
| Telephone | 48,217 | 25,178 |
| Title Expense | 3,885 | 2,099 |
| Travel and Entertainment | 18,658 | 1,306 |
| Utilities | 9,583 | 7,512 |
| Warranty Expense | - | 123,396 |
| **TOTAL EXPENSES** | 2,803,621 | 1,547,161 |

See accompanying notes and independent auditors' report

4

| | | |
|---|---:|---:|
| NET INCOME/(LOSS), BEFORE PROVISION FOR INCOME TAXES | (686,491) | 118,170 |
| INCOME TAX EXPENSE | - | (23,636) |
| NET INCOME/(LOSS) | (686,491) | 94,534 |
| RETAINED EARNINGS, at December 31, 2005 | 67,173 | 2,639 |
| Reissuance of Treasury Stock | - | (30,000) |
| RETAINED EARNINGS, at December 31, 2006 | $ (619,318) | $ 67,173 |

BCC EXHIBIT B Page 5

### SYNERGY ACCEPTANCE CORP.
### STATEMENT OF CASH FLOWS
#### For The Years Ended December 31, 2006 and 2005

| | 2006 | 2005 |
|---|---:|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net Income/(Loss) | (686,491) | $ 94,534 |
| Adjustment to Reconcile Net Income/(Loss) to | | |
| Net Cash Provided/(Used) by Operating Activities: | | |
| Depreciation | 25,038 | 7,027 |
| Bad Debt Expense | - | 110,000 |
| Changes in Assets and Liabilities: | | |
| (Increase) decrease in Accounts Receivable | (548,275) | - |
| (Increase) decrease in Auto Loans Receivable | 3,541,513 | (2,134,856) |
| (Increase) decrease in Prepaid Expenses | 17,941 | (15,296) |
| (Increase) decrease in Inventory | 81,729 | (70,118) |
| (Increase) decrease in Interest Receivable - Shareholders | (3,397) | (5,457) |
| Increase (decrease) in Accounts Payable | 182,654 | 633,122 |
| Increase (decrease) in Payroll Liabilities | (14,673) | 11,088 |
| Increase (decrease) in Auto Loans Payable | 42,569 | 187,176 |
| Increase (decrease) in Unearned Discount - Auto Loans | (1,097,870) | 837,006 |
| Increase (decrease) in Income Tax Payable | - | 23,636 |
| Net Cash Provided (Used) by Operating Activities | 1,540,738 | (322,138) |
| | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Purchase of Property and Equipment | (43,874) | (751,983) |
| (Increase) decrease in Related Party Receivables | (3,612,336) | (348,843) |
| (Increase) decrease in Loans Receivable - Other | (333,815) | (33,900) |
| (Increase) decrease in Loans Receivable - Shareholders | 15,000 | (139,230) |
| (Increase) decrease in Escrow Payment | - | 25,000 |
| Net Cash (Used) by Investing Activities | (3,975,025) | (1,248,956) |
| | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| | | |
| Increase in Notes Payable and Investor Debt | 205,470 | 2,861,064 |
| Decrease in Line of Credit | (100,510) | - |
| Increase (decrease) in Related Party Payables | 1,808,394 | (238,000) |
| Decrease in Treasury Stock | - | 30,000 |
| Reissuance of Treasury Stock | - | (30,000) |
| Net Cash Provided by Financing Activities | 1,913,354 | 2,623,064 |
| | | |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (520,933) | 1,051,970 |
| | | |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF YEAR | 1,049,296 | (2,674) |
| | | |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 528,363 | $ 1,049,296 |
| | | |
| Supplemental Disclosures: | | |
| Cash paid for Interest | $ 421,519 | $ 235,237 |

See accompanying notes and independent auditors' report.

6

### SYNERGY ACCEPTANCE CORP.
### NOTES TO THE FINANCIAL STATEMENTS
#### For the Year Ended December 31, 2006

## NOTE 1 - NATURE OF ACTIVITIES

Synergy Acceptance Corp. ("The Company") was incorporated in the State of California on April 11, 2003. On June 23, 2006, the Company merged into and became a Georgia corporation. The Company purchases auto loans for used cars and trucks from local auto dealers in its principal location in Canton, Georgia. The Company also resells auto loans to investment companies.

## NOTE 2 - SIGNIFICANT ACCOUNTING POLICIES

### Basis of Accounting
The financial statements of the Company have been prepared on an accrual basis of accounting in conformity with accounting principles generally accepted in the United States of America.

### Use of Estimates
The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results may differ from those estimates.

### Cash and Cash Equivalents
For the purpose of the statement of cash flows, the Company considers all highly liquid investments available for current use with an initial maturity of three months or less to be cash equivalents.

### Uninsured Cash Balances
The Company maintains its cash balances at one financial institution. Accounts are insured by the Federal Deposit Insurance Corporation up to $100,000. At December 31, 2006 and 2005 the Company's uninsured balances were $773,572 and $1,084,914, respectively.

### Accounts Receivable
The accounts receivable balance consists of an amount due from one investment company that purchased loans near the end of 2006, but the Company did not receive the payment until 2007.

### Auto Loans Receivable
In the normal course of business, the Company extends secured auto credit to all of its clients. Losses from installment contracts purchased are recognized in the period in which a determination can be made concerning the amount, if any, to be recovered from repossession of the automobile. Based upon experience, management has included in auto loan receivable balances its estimated allowance for uncollectible accounts which reflects the estimated total

7

## NOTE 2 - SIGNIFICANT ACCOUNTING POLICIES (CONTINUED)

of amounts which may eventually become uncollectible. The allowance for uncollectible accounts was $124,000 at December 31, 2006 and 2005, respectively. In 2006 the balance in Auto Loans Receivable decreased significantly due to the focus of the business shifting to the reselling of the loans to investment companies.

### Inventories
Inventories are stated at the lower of cost or market with cost determined by the specific identification method.

### Property and Equipment
Property and equipment are recorded at cost. Expenditures for major additions and improvements are capitalized and minor replacements, maintenance, and repairs are charged to expense as incurred. When property and equipment are retired or otherwise disposed of, the cost and accumulated depreciation are removed from the accounts and any resulting gain or loss is included in the results of operations for the respective period. Depreciation is calculated over the estimated useful lives of 39 years for the building and 3 to 7 years for furniture and equipment using the straight-line method. Depreciation expense for 2006 and 2005 was $25,038 and $7,027, respectively.

### Revenue Recognition
Interest revenue from auto loans receivable and certain deferred loan origination costs are recognized over the term of the receivable. Sales of auto loans are recognized when the sales contract for a group of loans is signed.

### Income Taxes
Deferred income taxes arise from timing differences resulting from income and expense items reported for financial accounting and tax purposes in different periods. Deferred taxes are classified as current or noncurrent, depending on the classification of the assets and liabilities to which they relate. Deferred taxes arising from timing differences that are not related to an asset or liability are classified as current or noncurrent depending on the periods in which the timing differences are expected to reverse.

### Advertising
The Company expenses advertising costs as incurred. Expenses incurred were $27,275 and $1,727 for 2006 and 2005, respectively.

## NOTE 3 – UNEARNED DISCOUNT - AUTO LOANS
The difference between the face value of the auto loans receivable and the purchase price of the auto loans receivable is the unearned discount. The unearned discount is carried to income on a prorated basis as the auto loans receivable is collected over the payment terms.

8

## NOTE 4 -- AUTO LOANS PAYABLE

The Company recognizes auto loans receivable at the time of the credit approval. The dealers from whom the loans are purchased are paid at that time or soon after that time. Contracts that have not been paid for as of December 31, 2006 are carried as auto loans payable.

## NOTE 5 - RELATED PARTY TRANSACTIONS

The Company extended unsecured credit to Synergy Motor Company, a related party, during 2006 and 2005. This loan has no maturity date or stated interest rate. The balance due from Synergy Motor Company at December 31, 2006 and 2005 was $3,624,586 and $348,844, respectively. The Company also extended unsecured credit to Dun-Rite Automotive, LLC and Global Gap Corp., both related parties, during 2006. These loans have no maturity date or stated interest rate. The balance due from Dun-Rite Automotive,LLC at December 31, 2006 was $412,594 and from Global Gap Corp. was $54,000. The Company owes National Viatical, Inc., a related party, $1,808,394 in unsecured credit at December 31, 2006. The Company also does business with other companies with common ownership.

## NOTE 6 - LINE OF CREDIT

The Company had a line of credit with a financial institution in the amount of $100,000 with a variable interest rate based on the index rate. The line of credit was paid in full in 2006. At December 31, 2006 and December 31, 2005 the outstanding balance due was $0 and $100,510, respectively.

## NOTE 7 - NOTES PAYABLE AND INVESTOR DEBT

The note payable is a three year loan for the principal amount of $750,000 from an unrelated company that bears interest at 7.5%. The loan is personally guaranteed by the officers of the Company.

The investor debt consists of loans to the Company that bear interest at rates ranging from 9.00% to 12.50%.

The future maturities of long-term debt are as follows:

|                                | 2006        | 2005        |
|--------------------------------|-------------|-------------|
| Notes Payable                  | $ 459,362   | $ 712,609   |
| Investor Debt                  | 4,266,356   | 3,807,639   |
| Less Current Maturities        | (742,242)   | (354,740)   |
| Long-Term Portion of Total Debt | $3,983,476 | $4,165,508  |

9

## NOTE 7 – NOTES PAYABLE AND INVESTOR DEBT (CONTINUED)

Maturities of the note payable and investor debt at December 31, 2006 are as follows:

| | |
|---|---|
| 2007 | $ 742,242 |
| 2008 | 3,300,762 |
| 2009 | 682,714 |
| 2010 | - |
| 2011 | - |
| Thereafter | - |
| | 4,725,718 |

The interest expense for these loans totaled $421,519 and $235,237 at December 31, 2006 and 2005, respectively.

## NOTE 8 – STOCK OWNERSHIP

The Company has 1,000,000 shares of no par stock authorized, and 2,000 shares issued and outstanding, as of December 31, 2006. The table below summarizes the stock ownership as of December 31, 2006 of Synergy Acceptance Corp.

| Stockholders | Number of Shares | Stock Percentages |
|---|---|---|
| Clear Skies Holding Company, LLC | 1300 | 65% |
| Robert Smith | 600 | 30% |
| David Kagel | 100 | 5% |
| Total | 2,000 | 100% |

## NOTE 9 – OPERATING FACILITIES

During 2004 and the first ten months of 2005 the Company leased office space in Canton, Georgia. The monthly payment was $5,000. The lease was terminated in November 2005 when the purchase of the building was finalized as referenced in Note 14.

10

## NOTE 10 – INCOME TAXES PAYABLE

Accrued income taxes for the year ended December 31, 2005 consist of the following:

| | |
|---|---|
| Federal | $16,867 |
| Georgia | 5,169 |
| California | 1,600 |
| **Total** | **$23,636** |

There are no additional income taxes accrued for the year ended December 31, 2006.

## NOTE 11 – LOANS RECEIVABLE-OTHER

In 2006 and 2005, the Company extended unsecured credit to several parties.
The outstanding balances at December 31, 2006 and 2005 are as follows:

| | 2006 | 2005 |
|---|---|---|
| L & H Tire | $ 0 | $ 9,000 |
| D. Settles | 0 | 4,000 |
| Conyers Auto Sales | 65,165 | 29,900 |
| Auto Loan Finders | 229,564 | 0 |
| **Total** | **$294,729** | **$42,900** |

The Company also issued a loan secured by a vehicle to an individual during 2006. The balance owed to the Company at December 31, 2006 was $6,934.
The Company was owed $75,052 from a vendor at December 31, 2006 due to an invoice being paid twice.

## NOTE 12 – LOANS TO SHAREHOLDERS

In 2005 and 2006, the Company extended unsecured credit to two shareholders.
The total balance due to the Company from the shareholders at December 31, 2006 and 2005 was $139,230 and $154,230, respectively. The shareholders are charged interest on these loans at an annual rate of 6%. The interest receivable on these loans at December 31, 2006 and 2005 was $8,854 and $5,457, respectively.

11

## NOTE 13– SUBSEQUENT EVENTS

In 2005, a lawsuit was filed against L & H Tire to collect the funds due to the Company referenced in NOTE 11. As of December 2005, a judgment was issued in favor of the Company for the entire amount due from L & H Tire. The total amount was paid to the Company in 2006.

## NOTE 14 – RECLASSIFICATIONS

Certain amounts in the prior year financial statements have been reclassified for comparative purposes to conform to the presentation in the current year financial statements. These reclassifications have not had any impact on net income.

## NOTE 15 - VARIABLE INTEREST ENTITIES

In December 2003, the Financial Accounting Standards Board (FASB) issued revised FASB Interpretation 46 (FIN 46), "Consolidation of Variable Interest Entities." FIN 46 requires that a company that holds variable interests in an entity consolidate the entity if the company's interest in the variable interest entity (VIE) is such that the company will absorb a majority of the VIE's expected losses and/or receive a majority of the VIE's expected residual returns, if they occur. In such cases, the company is the Primary beneficiary of the VIE. FIN 46 also requires additional disclosures by primary beneficiaries and other significant variable interest holders.

The majority owner of the Company is an LLC whose member is an owner of several related party companies that borrow funds from, lend funds to, and conduct other business with the Company on a regular basis. The Company has elected not to consolidate the financial information of these companies with that of the Company. Including financial information from other companies which operate in other industries not related to the stated business activity of this Company might confuse the reader of the financial statements.

## NOTE 16 – OPERATING LEASES

The Company leases certain office equipment under operating leases with various monthly rental amounts. Total lease expenses were $17,415 and $20,656 for 2006 and 2005, respectively. Minimum lease payments on long-term operating leases at December 31, 2006 are as follows:

BCC EXHIBIT B Page 12

NOTE 16 – OPERATING LEASES (CONTINUED)

<u>Year ending December 31,</u>

| | |
|---|---|
| 2007 | $ 5,873 |
| 2008 | 5,014 |
| 2009 | 1,829 |
| Total | $12,716 |

13

Exhibit C

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

# Table of contents

Independent auditors' report                                                        2 - 3

**Financial statements**

Statement of assets and liabilities                                                     4

Statement of income                                                                 5

Statement of changes in net assets attributable to holders of redeemable shares          6

Statement of cash flows                                                              7

Notes to the financial statements                                                  8 - 19

Exhibit C APAL Financials



**KPMG Accountants B.V.**
Emancipatie Boulevard 18
P.O. Box 3082
Curaçao
Netherlands Antilles

Telephone  (599-9) 732-5100
Telefax     (599-9) 737-5588
Internet    www.kpmg.an

Our ref  09/05-017

The Board of Directors and Shareholders
American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

## INDEPENDENT AUDITORS' REPORT

We have audited the accompanying financial statements of American Pegasus Auto Loan Fund Segregated Portfolio (a segregated portfolio of American Pegasus SPC) (the "Fund"), which comprise the statement of assets and liabilities as at December 31, 2008, and the statement of income, the statement of changes in net assets attributable to holders of redeemable shares and the statement of cash flows for the year then ended, and a summary of significant accounting polices and other explanatory notes.

*Management's responsibility for the financial statements*
Management is responsible for the preparation and fair presentation of these financial statements in accordance with International Financial Reporting Standards. This responsibility includes: designing, implementing and maintaining internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error; selecting and applying appropriate accounting policies; and making accounting estimates that are reasonable in the circumstances.

*Auditors' responsibility*
Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with International Standards on Auditing. Those standards require that we comply with relevant ethical requirements and plan and perform the audit to obtain reasonable assurance whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting principles used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

KPMG Accountants B.V. is a Netherlands Antilles limited liability
company, statutory seat Curaçao and a member firm of the KPMG
network of independent member firms affiliated with KPMG
International, a Swiss cooperative

page 2

Exhibit C APAL financials



*Opinion*

In our opinion, the financial statements present fairly, in all material respects, the financial position of American Pegasus Auto Loan Fund Segregated Portfolio (a segregated portfolio of American Pegasus SPC) as at December 31, 2008, and its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards.

*Emphasis of matter*

Without qualifying our opinion, we draw attention to Notes 4 and 6 to the financial statements describing the significant exposure of the Fund to credit risk under the current market conditions and the inherent uncertainties regarding auto loans. The financial statements are based on management's judgments, estimates and assumptions. The estimates and associated assumptions with respect to receivables relating to auto loans are based on historical experience and various other factors, including the current economic environment, that management believes to be reasonable under the circumstances. Illiquid credit markets increase the uncertainty inherent in such estimates and assumptions. Actual results may differ from these estimates.

Curaçao, Netherlands Antilles,
August 5, 2009

KPMG ACCOUNTANTS B.V.

Sanjay Agarwal, FCA

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

## Statement of assets and liabilities
## December 31, 2008

| (in USD) | Note | 2008 | 2007 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | 3 | 1,713,579 | 2,141,663 |
| Promissory notes due from related parties | 7 | 15,099,611 | 10,566,111 |
| Promissory notes receivable | | 308,500 | - |
| Auto loans receivable | 4 | 37,361,122 | 48,427,975 |
| Repossessed vehicles | 5 | 14,007,382 | 8,158,975 |
| Balances due from financing company | 7 | 10,681,721 | 3,488,447 |
| Interest receivable on auto loans | 1 | 1,772,050 | 2,004,253 |
| Receivable for repossessed vehicles sold | | 2,350,431 | 42,412 |
| Receivable for auto loans sold | | - | 33,759 |
| Receivable for auto loans cancelled or refinanced | | - | 1,590,938 |
| Receivables from related portfolios | 7 | 8,507,198 | 5,212,679 |
| Prepaid loan origination and repossession fees | 7 | 5,045,610 | 8,621,429 |
| Other assets and prepaid expenses | | 287,209 | 237,575 |
| **Total assets** | | **97,134,413** | **86,514,216** |
| **Liabilities** | | | |
| Total return swap with related parties | 7 | 71,944,791 | 69,691,033 |
| Payable for auto loans purchased | | 443,795 | - |
| Prepayments for auto loans sold | | 137,193 | - |
| Incentive fee payable | 7 | 345,719 | 503,289 |
| Incentive allocation payable | 7 | 149,047 | - |
| Subscriptions received in advance | | 100,000 | 500,000 |
| Management fees payable | 7 | 227,183 | 197,709 |
| Promissory notes payable | | 4,907,980 | - |
| Accrued expenses and accounts payable | | 163,374 | 71,879 |
| **Total liabilities (excluding net assets attributable to holders of redeemable shares)** | | **78,419,072** | **70,963,910** |
| Net assets attributable to holders of redeemable shares | | **18,715,341** | **15,550,306** |
| **Net asset value per Common Share Class 23:** | | | |
| 108,675.602 (2007: 100,464.047) outstanding shares | 2 | **$172.21** | **$155.78** |

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

## Statement of income
## For the year ended December 31, 2008

| (in USD) | Note | 2008 | 2007 |
|---|---|---:|---:|
| **Investment income** | | | |
| Interest on auto loans | | 6,534,144 | 8,957,873 |
| Interest income on bank accounts | | 31,268 | 646,870 |
| Realized loss on sale of auto loans | | (94,647) | (38,461) |
| Realized and unrealized gain on auto loans | 4 | 7,621,379 | 2,908,450 |
| Amortized discount on auto loans | | 1,021,439 | 1,418,460 |
| Interest income on promissory notes | 7 | 1,342,000 | 191,111 |
| Interest on receivables from related portfolios | 7 | 500,487 | 105,579 |
| Other income | | 17,310 | 20,088 |
| **Total Investment Income** | | **16,973,380** | **14,209,970** |
| | | | |
| **Expenses** | | | |
| Incentive fees | 7 | 330,789 | 331,049 |
| Management fees | 7 | 264,437 | 120,529 |
| Administration fees | | 124,646 | 97,778 |
| Directors' fees | | 3,211 | 3,153 |
| Sales commissions | | 210,071 | 161,835 |
| Miscellaneous expenses | | 150,357 | 41,455 |
| Professional fees | | 180,067 | 63,440 |
| Marketing fees | | 56,820 | 191,182 |
| Consulting fees | 7 | 93,333 | - |
| Bank charges | | 2,995 | 3,265 |
| Travel expenses | | 64,405 | 61,400 |
| Repossession fees | 7 | 3,681,737 | 2,114,425 |
| **Operating expenses before finance costs** | | **5,062,868** | **3,189,511** |
| | | | |
| **Net result from operations before finance costs** | | **11,910,572** | **11,020,459** |
| | | | |
| **Finance costs** | | | |
| Unrealized losses on swap with related parties | | (8,717,676) | (9,857,574) |
| Realized gains (losses) on swap with related parties | | (1,146,547) | 161,311 |
| Interest expense on notes | | (207,080) | - |
| **Total finance costs** | | **(10,071,303)** | **(9,696,263)** |
| | | | |
| **Change in net assets from operations attributable to holders of redeemable shares** | | **1,839,269** | **1,324,196** |

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

## Statement of changes in net assets attributable to holders of redeemable shares
### For the year ended December 31, 2008

| *(in USD)* | 2008 | 2007 |
|---|---:|---:|
| **Balance at beginning of year** | 15,650,306 | 2,270,718 |
| Change in net assets from operations | 1,839,269 | 1,324,195 |
| Issue of redeemable shares during the year | 2,352,481 | 12,731,338 |
| Redemptions of redeemable shares | (1,084,347) | (729,597) |
| Rebates | 60,855 | 53,651 |
| Incentive allocations | (103,223) | - |
| **Balance at December 31, 2008** | 18,715,341 | 15,650,306 |

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

## Statement of cash flows
## For the year ended December 31, 2008

| | 2008 | 2007 |
|---|---:|---:|
| *(in USD)* | | |
| **Cash flows from operating activities** | | |
| Change in net assets from operations | 1,839,269 | 1,324,196 |
| Adjustments to reconcile change in net assets from operations to net cash from operating activities: | | |
| Purchases of auto loan contracts, net of discount | 3,241,169 | (39,327,946) |
| Decrease (increase) in receivable for auto loans sold | 170,952 | 8,596 |
| Increase in promissory notes due from related parties | (4,533,500) | (10,566,111) |
| Increase in promissory notes receivable | (308,500) | - |
| Increase in promissory notes payable | 4,907,980 | - |
| Unrealized losses on swap with related parties | 8,717,676 | 9,867,574 |
| Realized gains (losses) on swap with related parties | 1,146,547 | (161,311) |
| Increase in balances due from financing company | (7,193,274) | (2,757,606) |
| Decrease (increase) in interest receivable on auto loans | 232,203 | (1,674,566) |
| Decrease (increase) in receivable for repossessed vehicles sold | (2,308,019) | 127,239 |
| Increase in receivables from related parties | (3,294,519) | (5,212,679) |
| Decrease (increase) in prepaid loan origination and repossession fees | 3,675,819 | (8,621,429) |
| Increase in other assets and prepaid expenses | (49,634) | (215,931) |
| Increase in payables | 112,446 | 371,443 |
| **Cash flows from operating activities** | **6,256,615** | **(56,848,531)** |
| | | |
| **Cash flows from financing activities** | | |
| Proceeds from issue of redeemable shares | 1,952,461 | 13,071,338 |
| Rebate shares issued | 60,865 | 53,651 |
| Redemptions of redeemable shares | (1,084,347) | (729,597) |
| Incentive allocation | (103,223) | - |
| Proceeds from swaps | 3,000,123 | 36,578,865 |
| Redemption of swaps | (10,510,588) | (3,072,569) |
| **Cash flows from financing activities** | **(6,684,599)** | **45,901,678** |
| | | |
| **Net decrease in cash and cash equivalents for the year** | **(428,064)** | **(10,946,853)** |
| | | |
| Cash and cash equivalents at beginning of year | 2,141,663 | 13,088,516 |
| **Cash and cash equivalents at end of year** | **1,713,579** | **2,141,663** |
| | | |
| **Cash flows from operating activities include:** | | |
| Interest paid | 17,100 | 9 |
| Interest received | 6,797,615 | 7,936,030 |

See accompanying notes to the financial statements

## Notes to the financial statements

### (1) Description of business

American Pegasus SPC (the "Company") was incorporated as an exempted company with limited liability in the Cayman Islands as of June 16, 2004 and is registered as a segregated portfolio company under Section 233(1) of the Companies Law (2003 Revision) of the Cayman Islands. The American Pegasus Auto Loan Fund (the "Fund") is a segregated portfolio of the Company, which commenced operations on October 1, 2005. These financial statements cover the operations of the Fund for the year ended December 31, 2008.

The registered office of the Fund is located at ATC Trustees (Cayman) Limited, P.O. Box 30592 S.M.B Cayside, 2nd Floor, Harbour Drive, Grand Cayman, Cayman Islands, BWI.

The Fund's investment objective is to earn a steady return by purchasing sub-prime auto loans issued in the United States and by selling such loans in the secondary market.

The investment activities of the Fund were managed by American Pegasus Investment Management, Inc. as described in the Investment Management Agreement which was terminated July 31, 2008 at the request of American Pegasus Investment Management Inc. Effective August 1, 2008, the Fund entered into an investment management agreement with American Pegasus LDG, LLC (the "Investment Manager") to manage the investment activities of the Fund. The administration of the Fund is delegated to ATC Fund Services (Curaçao) N.V.

The financial statements were authorized for issue by the directors on August 5, 2009.

### Statement of compliance

The accompanying financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") and interpretations adopted by the International Accounting Standards Board (the "IASB").

### New standards and interpretations not yet adopted

A number of new standards, amendments to standards and interpretations that are relevant to the Fund are not yet effective for the year ended December 31, 2008, and have not been applied in preparing these financial statements. The most relevant new standards are:

- IAS 1 (revised), *Presentation of financial statements*. The revised standard requires all changes in equity arising from transactions with owners in their capacity as owners to be presented separately from non owner changes in equity ("total comprehensive income"), which may be presented in either a single statement of comprehensive income or in an income statement and a separate statement of comprehensive income (effective from January 1, 2009).

- IFRS 8, *Operating Segments*. The revised standard introduces the "management approach" to segment reporting. IFRS 8, which becomes mandatory for the Fund's 2009 financial statements, will require a change in the presentation and disclosure of segment information based on the internal reports regularly reviewed by management in order to assess each segment's performance and to allocate resources to them. Currently, the Fund presents segment information in respect of its industry and geographical segments (effective from January 1, 2009)

- Amendments to IAS 32, *Financial Instruments: Presentation* and IAS 1 *Presentation of Financial Statements – Puttable Financial Instruments and Obligations Arising on Liquidation*. The amendments require puttable instruments, and instruments that impose on the entity an obligation to deliver to another party a pro rata share of the net assets of the entity only on liquidation, to be classified as equity, provided the financial instruments have particular features and meet specific conditions (effective from January 1, 2009).

The amendments, which become mandatory for the entity's 2009 financial statements, are not expected to have any significant impact on the financial statements.

**Basis of preparation**
The financial statements are presented in United States dollars ("USD") and rounded to the nearest US dollar. They are prepared on a fair value basis for financial assets and financial liabilities at fair value through profit or loss and derivative financial instruments. Other financial assets and financial liabilities are stated at amortised cost or redemption amount.

The preparation of financial statements in conformity with IFRS requires management to make judgements, estimates and assumptions that affect the application of policies and the reported amounts of assets and liabilities, income and expense. The estimates and associated assumptions are based on historical experience and various other factors, including the current economic environment, that are believed to be reasonable under the circumstances, the results of which form the basis of making the judgements about carrying values of assets and liabilities that are not readily apparent from other sources. Illiquid credit markets increase the uncertainty inherent in such estimates and assumptions. Actual results may differ from these estimates.

The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimate is revised if the revision affects only that period or in the period of the revision and future periods if the revision affects both current and future periods.

**Foreign currency translation**
Transactions in foreign currencies are translated at the foreign currency exchange rate ruling at the date of the transaction. Monetary assets and liabilities denominated in foreign currencies are translated to USD at the foreign currency closing exchange rate ruling at the balance sheet date. Foreign currency exchange differences arising on translation and realised gains and losses on disposals or settlement of monetary assets and liabilities are recognised in the income statement. Non-monetary assets and liabilities denominated in foreign currencies that are measured at fair value are translated to USD at the foreign currency exchange rate ruling at the dates that the values were determined. Foreign currency exchange differences relating to investments at fair value through profit or loss and derivative financial instruments are included in gain (loss) on investments and gain (loss) on derivatives, respectively. All other foreign currency exchange differences relating to monetary items, including cash and cash equivalents are presented separately in the statement of income.

**Financial instruments**

*Classification*
The category of financial assets and financial liabilities at fair value through profit or loss comprises of financial instruments held for trading. This includes the total return swaps. All derivatives in a net receivable position (positive fair value), as well as options purchased, are reported as financial assets held-for-trading. All derivatives in a net payable position (negative fair value), as well as options written, are reported as financial liabilities held-for-trading.

Financial assets that are classified as loans and receivables include receivable from related parties, receivable for auto loans, receivable for repossessed vehicles sold, balances due from financing company, interest receivable on auto loans, receivable for auto loans sold, receivable for auto loans cancelled or refinanced, promissory notes, prepaid loan origination and repossession fees and other assets and prepaid expenses.

Financial liabilities that are not at fair value through profit or loss include accrued expenses and accounts payable, payable for auto loans purchased, incentive fee payable, management fee payable and subscriptions received in advance.

### Recognition
The Fund recognizes financial assets and financial liabilities on the date it becomes a party to the contractual provisions of the instrument.

A regular way purchase of financial assets is recognized using trade date accounting. From this date any gains and losses arising from changes in fair value of the financial assets or financial liabilities are recorded.

Financial liabilities are not recognized unless one of the parties has performed or the contract is a derivative contract not exempted from the scope of IAS 39.

### Measurement
Financial instruments are measured initially at fair value (transaction price) plus, in case of a financial asset or liability not at fair value through profit or loss, transaction costs that are directly attributable to the acquisition or issue of the financial asset or financial liability. Transaction costs on financial assets and financial liabilities at fair value through profit or loss are expensed immediately, while on other financial instruments they are amortized.

Financial liabilities, other than those at fair value through profit or loss, are measured at amortized cost using the effective interest rate. Financial liabilities arising from the redeemable shares issued by the Fund are carried at the redemption amount representing the investors' right to a residual interest in the Fund's assets

### Fair value measurement principles
The carrying amounts of the Fund's financial assets and financial liabilities at the balance sheet date approximated management's best estimate of their fair values.

A financial liability is derecognized when the obligation specified in the contract is discharged, cancelled or expired.

### Specific Instruments

*Receivable for auto loans*
Receivables for auto loans are recorded initially at transaction price plus all acquisition costs that are directly attributable to the purchase of the receivable for auto loans. This includes a loan origination fee paid by the Fund to the originator of the loan. The auto loans are acquired by working with finance companies who purchase and aggregate the individual auto loans from the car dealerships. Once these individual auto loans are aggregated into a portfolio, the Fund then purchases the entire portfolio of auto loans.

The receivables for auto loans are carried at amortized cost using the effective interest rate method, less impairment losses, if any.

*Swaps*

American Pegasus Auto Loan Fund (Dist) Segregated Portfolio ("APAL") and American Pegasus APW Fund Segregated Portfolio ("APW"), related segregated portfolios of the Company, seek capital appreciation through investing their assets in the Fund. As the Fund, APW and APAL are segregated portfolios of the same Company, shares are not allowed to be purchased or sold between the segregated portfolios. Cash received from the related segregated portfolios intended for subscriptions in the Fund's Class 23 shares is accounted for in the form of a total return swap which entitles the invested amounts to a return from the Fund as if they were invested in Class 23 shares at the date of receiving the amounts. The Fund makes a notional allocation of shares in the Fund to the total return swap based on the net asset value of such shares at the time of the cash transfer. The liability on the swap is valued using the net asset value of the Class 23 shares applied to the notional number of shares allocated to APAL and APW.

**Impairment**

Financial assets that are stated at cost or amortised cost are reviewed periodically to determine whether there is objective evidence of impairment. If any such indication exists, an impairment loss is recognised in the income statement as the difference between the asset's carrying amount and the estimated sales price of the secured assets. The impairment amount is based on management's assessment of the recoverable amount, which includes amounts recoverable from collateral. Residual balances are impaired as a group based on historical data.

If in a subsequent period the amount of an impairment loss recognised on a financial asset carried at amortised cost decreases and the decrease can be linked objectively to an event occurring after the write-down, the write-down is reversed through the income statement.

***Derecognition***

The Fund derecognizes a financial asset when the contractual rights to the cash flows from the financial asset expire or it transfers the financial assets and the transfer qualifies for derecognition in accordance with IAS 39.

The Fund uses the specific identification method to determine realized gains and losses on derecognition.

**Interest income**

Interest income and expense is recognized in the income statement as it accrues, using the effective interest rate of the instrument calculated at the acquisition or origination date. Interest income on impaired loans is not accrued or recognized in the income statement as of the moment of impairment.

**Taxation**

There are no taxes on income or gains in the Cayman Islands and, in accordance with the provisions of section 6 of the Tax Concessions Law, the Company has received an undertaking from the Governor in Council in the Cayman Islands exempting it from all local taxes on profits, income or gains until April 2024. Accordingly, no provision for income taxes is included in these financial statements.

Interest and dividend income received by the Fund may be subjected to withholding tax imposed in the country of origin.

**Cash and cash equivalents**

Cash comprises current deposits with banks. Cash equivalents are short-term highly liquid investments that are readily convertible to known amounts of cash, are subject to an insignificant risk of changes in value, and are held for the purpose of meeting short-term cash commitments rather than for investment or other purposes.

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

**(2) Share capital**

The authorized share capital of the Company is USD250,000, divided into 24,999,900 non-voting redeemable participating shares of USD0.01 per value each and 100 voting, non-redeemable non-participating management shares of USD0.01 par value each. All management shares of the Company are issued and registered in the name of the Investment Manager. The Company has allocated 550,000 shares to the Fund which have been designated as Common Shares Class 23 of the Company.

Common Shares Class 23 can be purchased generally on the first day of each calendar month and require an initial minimum investment amount of USD25,000 for new investors.

Shares are generally eligible for redemption as of the end of any calendar quarter. Redemptions require at least 45 days written notice. The redemption price will equal the net asset value of the shares of the relevant series calculated on the date of redemption, after adjustment for the incentive fee earned through the date on which the net asset value is determined. Shares may only be redeemed with the consent of a Director and there is no right to require the Fund to redeem shares. Redemption amounts generally will be paid within 30 days after the effective date of the redemption.

The movements in numbers of issued and outstanding Common Shares Class 23 are as follows:

| (number of shares) | 2008 | 2007 |
|---|---|---|
| Opening balance | 100,464.047 | 16,733.368 |
| Subscriptions during the period | 14,434.543 | 88,214.800 |
| Shares rebates during the period | 368.299 | 364.814 |
| Redemptions during the period | (6,591.287) | (4,848.903) |
| **Ending balance** | **108,675.602** | **100,464.047** |

The investment manager has waived the 20% monthly incentive fee for certain investors so that the amount of incentive fees charged to these investors are given back to the investors in the form of share rebates (deducted from the incentive fee payable and booked as an additional subscription).

**(3) Cash and cash equivalents**

| (in USD) | 2008 | 2007 |
|---|---|---|
| Northern Trust Cash | 3,579 | 1,663 |
| Northern Trust Cash – interest bearing deposits | 1,710,000 | 2,140,000 |
| **Cash and cash equivalents** | **1,713,579** | **2,141,663** |

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

**(4)  Receivables for auto loans**

| *(in USD)* | 2008 | 2007 |
|---|---|---|
| Receivable for auto loans | 19,056,144 | 48,241,336 |
| Residual balances on defaulted loans | 21,761,455 | 3,842,640 |
| Less: Unamortized discount | (883,746) | (4,044,923) |
| Less: Impairment provision | (2,572,731) | (1,611,078) |
| Total | 37,361,122 | 46,427,975 |

Auto loans mature in a period between 1 to 4 years from origination. The interest rate charged on the loans is based on the credit rating of the borrower. The average interest rate is 25.03% (2007: 25.22%). The average interest rate is calculated as the weighted average interest rate, as stated on the individual auto loans, and weighted by their payoff balances as of December 31, 2008.

Residual balances on defaulted loans relate to remaining receivables on auto loans that defaulted and for which the related vehicle has been repossessed. For auto loans in default, the remaining balance on the auto loan at the time of repossession of the related vehicle and any repossession expenses incurred by the Fund will be recouped by the Fund by selling the repossessed vehicle and collecting the residual balances on defaulted loans from the loan holders. Collection and timing of collection are due to several uncertainties relating to, amongst others, possible bankruptcies of the loan holders, future income levels, tax rates, wage garnishment and debt position of the loan holders.

Due to the nature of its business, the Fund is also exposed to significant credit and liquidity risk on the receivables for auto loans as further described in note 6.

**Realized and unrealized gain (loss) on auto loans**

| *(in USD)* | 2008 | 2007 |
|---|---|---|
| Impairment loss on revaluation | (5,457,256) | (403,985) |
| Net gains on prepaid loans | 165,333 | 78,588 |
| Residual balances claims on defaulted loans and insurance claims | 12,913,302 | 3,233,847 |
| Total | 7,621,379 | 2,908,450 |

**(5)  Repossessed vehicles**

In the event that the interest and principal payments on auto loans are not received in a timely manner, the vehicle is repossessed and valued at an estimated recovery value of the vehicle which is based on the Kelley Blue Book value.

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

## (6) Financial Instruments and associated risks

The Fund maintains positions in a variety of non-derivative financial instruments as dictated by its investment management strategy. The Fund's investment portfolio consists primarily of investments in auto loans.

The Fund's investing activities expose it to various types of risk that are associated with the financial instruments and markets in which it invests. The most important types of financial risk to which the Fund is exposed are market risk, credit risk and liquidity risk.

Asset allocation is determined by the Investment Manager who manages the distribution of the assets to achieve the investment objective. Divergence from target asset allocations and the composition of the portfolio is monitored by the Investment Manager.

The nature and extent of the risks associated with the financial instruments outstanding at the balance sheet date are discussed below.

### Market risk

Market risk embodies the potential for both loss and gains and includes currency risk, interest rate risk and price risk.

The Fund's strategy on the management of investment risk is driven by the Fund's investment objective. The Fund's investment objective is to earn a steady return by purchasing sub-prime auto loans issued in the United States and by selling such loans in the secondary market. The Fund's market risk is managed on a regular basis by the Investment Manager in accordance with policies and procedures in place, as described in the Offering Memorandum. The Fund's overall market positions are monitored on an ongoing basis by the Investment Manager.

#### Currency risk

The Fund may invest in financial instruments and enter into transactions denominated in currencies other than its functional currency. Consequently, the Fund is exposed to risks that the exchange rate of its currency relative to other foreign currencies may change in a manner that has an adverse affect on the value of that portion of the Fund's assets or liabilities denominated in currencies other than the USD. At balance sheet date all of the Fund's assets and liabilities were denominated in USD.

#### Price risk

Price risk is the risk that the value of the instrument will fluctuate as a result of changes in market prices, whether caused by factors specific to an individual investment, its issuer or all factors affecting all instruments in the portfolio.

There is a price risk associated with the decline in automobile values. Once a loan is in default, and the Fund repossesses the automobile collateral, the Fund is exposed to the risks associated with the selling of the vehicle. If used car prices were to decline significantly, the Fund would suffer a greater loss.

The Fund is also exposed to the risk associated with the cost of repairing a repossessed vehicle, as well as the cost of repossessing the vehicles. If these costs were to rise, the Fund would experience a greater loss. The Fund is exposed to reinvestment risks. There are no assurances that the Fund may be able to reinvest cash flows in loans with similar interest rates and similar qualities.

Repossessed vehicles and reserve for repossession expenses are exposed to price risk as of December 31, 2008 and amount to USD14,034,505 (December 31, 2007: USD5,091,348)

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

*Sensitivity analysis*
A 5% increase in prices of repossessed vehicles, cost of repairing and marketing repossessed vehicles and the cost of repossessing the vehicles at December 31, 2008 would have increased the net assets attributable to holders of redeemable shares and the changes in net assets attributable to holders of redeemable shares by USD120,320 or 62 basis points (2007: USD39,874 or 25 basis points); an equal change in the opposite direction would have decreased the net assets attributable to holders of redeemable shares by USD137,263 or 73 basis points.

*Interest rate risk*
The majority of the Fund's assets are interest-bearing at fixed interest rates. The table below summarises weighted average effective interest rates for the interest-bearing financial instruments:

| | 2008 | 2007 |
|---|---|---|
| *(in USD)* | | |
| **Assets** | | |
| Interest bearing deposits | 2.30% | 2.56% |
| Auto loans receivable | 25.03% | 25.22% |
| Promissory notes from related parties | 10.04% | 10% |
| Receivable from related portfolios | 8.28% | 3.35% |
| **Liabilities** | | |
| Promissory notes issued | 7.19% | - |

*Sensitivity analysis*
The sensitivity analysis below has been determined based on the Fund's exposure to variable interest rates for interest bearing assets and liabilities at the date of the statement of assets and liabilities. As per December 31, 2008 and December 31, 2007, the variable interest bearing assets and liabilities consisted of cash & cash equivalents. The analysis assumes that the stipulated change takes place at the beginning of the financial year and is held constant throughout the reporting period in the case of instruments that have floating rates. A 100 basis point increase or decrease is used when reporting interest rate risk internally and represents management's assessment of the possible change in interest rates.

For the year ended December 31, 2008, an increase of 100 basis points in an annualized effective interest rate, applied to the amounts exposed to variable interest rates at the date of statement of assets and liabilities would have increased the net assets attributable to holders of redeemable shares by USD3,834 or 2 basis points (2007: USD28,070 or 17 basis points). A decrease of 100 basis points would have had an equal but opposite effect.

**Credit risk**
Credit risk is the risk that a counterparty to a financial instrument will fail to discharge an obligation or commitment that it has entered into with the Fund. The Investment Manager has a credit policy in place and the exposure to credit risk is monitored on an ongoing basis.

The Fund invests in subprime automobile loans. These are loans taken out by individual borrowers with less than average credit profile, to purchase automobiles. The risks associated with such an investment include, but are not limited to, defaults by the borrower of the loans. If the borrower were to lose his/her job, and unable to make the periodic loan payments, that would lead to a default on the loan. Even if the unemployment rate in the overall economy were to remain steady or improve, the Fund's borrowers may still default if they were to lose their jobs. If the Fund's borrowers are declared bankrupt, the Fund will not be able to collect the balances outstanding from such borrowers.

The Fund is exposed to the risks of enforceability of the contracts. Federal and state governments have enacted consumer protection laws which apply to the loans. These laws impose requirements with respect to the making, transfer, acquisition, enforcement and collection of consumer contracts and loans. These laws, as well as any new laws or rules which may be adopted may adversely affect the ability of the companies or the dealers from whom the loans were purchased to collect on these loans. If the dealer from whom the loans are acquired fails to comply with these consumer protection laws, the loans may not be enforceable. The dealer will make representations and warranties stating that the loans being purchased are valid and enforceable and that they complied with applicable laws at the time there were made. Sellers will be obligated to repurchase loans that do not comply with the applicable requirements of any consumer protection law if the Fund's interest in that loan is materially and adversely affected by such noncompliance.

The geographic concentrations of the loans may adversely affect the loans. Adverse economic conditions or other factors particularly affecting any state or region where a high concentration of auto loans is located could cause such auto loans to experience increased delinquency or loss.

During 2009, used car prices in the U.S. market have decreased by an average of 10.17%. Continuing declines in car values could necessitate further write downs in the Fund's loan portfolio that may be significant to the Fund's operating results. In addition, a sustained period of declining car values combined with the continued turbulence in the financial and credit markets and rising unemployment would continue to limit the Fund's loan related revenues. A sustained period of reduced loan revenues could significantly impact the Fund's operating results. The Fund cannot predict whether, when or the manner in which the economic conditions described above will change.

The Fund utilizes the services of loan servicing agents. The duties of such agents include chasing down the borrowers and undertaking steps to repossess vehicles that are subject to a loan. The loan servicing agents may fail to achieve the aforementioned services, thus, negatively impacting the performance of the Fund.

At December 31, 2008, the following financial assets were exposed to credit risk: auto loans receivable, cash and cash equivalents, promissory notes, balances due from financing company, interest receivable on auto loans, receivables and other assets and prepaid expenses. The carrying amounts of financial assets best represent the maximum credit risk exposure at the balance sheet date. Total carrying amount of financial assets exposed to credit risk amounted to USD97.1 million (December 31, 2007: USD86.6 million).

**Liquidity risk**
The loans in which the Fund invests are relatively illiquid. The Fund may not be able to liquidate those investments quickly if the need should arise, and its ability to realize gains, or to avoid losses in periods of rapid market activity, may therefore be affected. The value assigned to such positions for purposes of determining the Fund's Net Asset Value may differ from the value the Fund is ultimately able to realize.

The cars which the Fund holds, as the result of possessions on a defaulted loan, are relatively illiquid. The Fund may not be able to liquidate the vehicles quickly if the need should arise, and its ability to realize gains, or to avoid losses in periods of rapid market activity, may therefore be affected. The value assigned to such positions for purposes of determining the Fund's Net Asset Value may differ from the value the Fund is ultimately able to realize.

**(7) Related parties**

**Investment manager**

American Pegasus Investment Management, Inc., a Delaware corporation, was the Fund's investment manager through July 31, 2008 and furnished investment advisory services to the Fund. For its advisory services, the Fund paid a management fee monthly in advance on the first business day of each calendar month of an amount equal to 1.5% (on an annualized basis) of the net asset value of the shares including the total return swap. The fees are calculated on the opening value of the swap each month where the fee calculated reduces the swap value and increases the management fee payable. For the period from January 1, 2008 through July 31, 2008, management fees amounted to USD754,168 (2007: USD901,257), of which USD605,895 (2007: USD762,843) was deducted from the total return swap with related parties payable.

The Fund also paid American Pegasus Investment Management, Inc., an incentive fee equal to 20% of the net realized and unrealized appreciation, adjusted for the purchase and redemption of shares and any distribution, in the net asset value of the shares for that calendar month. The incentive fee is subject to a "high water mark" under which American Pegasus Investment Management, Inc., was eligible to receive an incentive fee only to the extent net profits earned by the Common Shares Class 23 exceed the cumulative net losses (adjusted for redemptions) that have not been recovered. The fees are also calculated on the opening value of this investment each month where the fee calculated reduces the swap value and increases the incentive fee payable. For the period from January 1, 2008 through July 31, 2008, American Pegasus Investment Management, Inc., earned an incentive fee of USD1,687,234 (2007: USD2,129,798), of which USD1,356,446 (2007: USD1,798,749) was deducted from the total return swap with related parties payable.

Effective August 1, 2008, American Pegasus LDG, LLC, a limited liability company organized under the laws of the State of Delaware (the "Investment Manager") acts as the Fund's Investment Manager and furnishes investment advisory services to the Fund. For its advisory services, the Fund pays a management fee monthly in advance on the first business day of each calendar month of an amount equal to 1.5% (on an annualized basis) of the net asset value of the shares including the total return swap. The fees are calculated on the opening value of the swap each month where the fee calculated reduces the swap value and increases the management fee payable. For the period from August 1, 2008 through December 31, 2008, management fees amounted to USD569,192, of which USD453,029 was deducted from the total return swap with related parties payable. The Investment Manager is also holder of the 100 Management Shares of the Company.

The Fund will also pay American Pegasus LDG Holdings, LLC ("Holdings"), an affiliate of the Investment Manager, an incentive allocation equal to 20% of the net realized and unrealized appreciation, adjusted for the purchase and redemption of shares and any distribution, in the net asset value of the shares for that calendar month. The incentive allocation is subject to a "high water mark" under which Holdings is eligible to receive an incentive allocation only to the extent net profits earned by the Common Shares Class 23 exceed the cumulative net losses (adjusted for redemptions) that have not been recovered. The incentive allocation is also calculated on the opening value of the swap investment each month where the incentive allocation reduces the swap value and increases Holdings capital account. For the period from August 1, 2008 through December 31, 2008, Holdings received an incentive allocation of USD507,837, of which USD404,614 was deducted from the total return swap with related parties payable. Holdings withdraws its capital account monthly such that it never maintains a participating balance in the Fund.

**Total return swap with related parties**

APAL and APW, related segregated portfolios of the Company, invest their assets in the Fund through total return swaps. The Fund, APAL and APW are segregated portfolios of the Company. See note 1 for further details on the swaps.

American Pegasus Auto Loan Fund Segregated Portfolio
(a segregated portfolio of American Pegasus SPC)

The total liability on the swap as at December 31, 2008 is as follows:

| (in USD) | American Pegasus APW Fund Segregated Portfolio | American Pegasus Auto Loan Fund (Dist) Segregated Portfolio | Total |
|---|---|---|---|
| Balance at January 1, 2008 at cost | 1,113,204 | 56,356,787 | 57,469,991 |
| Subscriptions during the year | 1,499,650 | 5,079,684 | 6,579,334 |
| Redemptions during the year | (2,743,118) | (4,151,364) | (6,894,482) |
| Realized gains on total return swap | 130,264 | 1,016,283 | 1,146,547 |
| Balance at December 31, 2008 at cost | - | 58,301,390 | 58,301,390 |
| Unrealized gains (losses) on total return swap | - | 13,769,448 | 13,769,448 |
| Balance at December 31, 2008 | - | 72,070,838 | 72,070,838 |
| Swap proceeds payable/Subscriptions to be transferred | 1,197,763 | (1,323,810) | (126,047) |
| Total | 1,197,763 | 70,747,028 | 71,944,791 |

**Receivables from related portfolios**

During the period the Fund granted total loans of USD4,367,031 to and received repayment in the amount of USD1,573,000 from the following funds which are segregated portfolios of American Pegasus SPC and are managed by the Investment Manager of the Fund:

- American Pegasus Income & Bonus Fund Segregated Portfolio;
- American Pegasus Fixed Income Fund Series II Segregated Portfolio;
- American Pegasus Fixed Income Fund IV Segregated Portfolio;
- American Pegasus Fixed Return Fund;
- American Pegasus Perpetual Income Fund.

These loans are unsecured, accrue interest at 10%, and are payable upon demand. The Fund earned an amount of USD500,487 (2007: USD105,579) in interest from these loans to related parties. As at December 31, 2008, USD7,908,978 (2007: USD5,114,945) plus USD598,222 (2007: USD97,735) accrued interest was receivable on these loans from the related parties.

**Synergy Acceptance Corp and Synergy Equity, LLC**

Synergy Acceptance Corp., a Georgia corporation, provides the following services to the Fund:

- Origination of auto loans;
- Servicing of auto loans;
- Repossessing of cars related to defaulting auto loans;
- Retailing of repossessed cars

Based on an agreement with Synergy Acceptance Corp dated July 2, 2007, the Fund has agreed to pay USD6,000,000 of the loan origination fees in advance and in return the Fund received a 10% discount on the loan origination fees (4.05% instead of 4.5% of the principal loan balances). Loan origination fees earned by Synergy Acceptance Corp. in 2008 amounted to USD208,938 (2007: USD812,944). As per December 31, 2008, prepaid loan origination fees amounted to USD4,978,118 (2007: USD5,187,056).

In addition, based on an agreement with Synergy Acceptance Corp dated December 30, 2007, the Fund has agreed to pay USD4,500,000 of the repossession repair expenses in advance and in return the Fund receives a $30 per hour discount on the labor rates ($65 hourly rate as opposed to a $95 hourly rate) associated with repossession repair expenses. Repossession and repair fees earned by Synergy Acceptance Corp in 2008 amounted to USD3,581,737 (2007: USD2,114,425). As per December 31, 2008, prepaid repossession expenses amounted to USD40,368 (2007: USD4,500,000).

The prepaid loan origination and repossession fees are presented net of reserve for repossession expenses on the balance sheet and amount to USD5,045,610 (2007: 8,621,429).

Synergy Acceptance Corp is owned by Synergy Equity LLC, owned by certain shareholders of the Investment Manager of the Fund.

Synergy Acceptance Corp., collects the principal and interest payments from the individual loan holders and maintains such balances in a segregated account. As per December 31, 2008, the balance of collected payments due to the Fund amounted to USD10,681,721 (2007: USD3,488,477)

### Notes with Synergy Equity, LLC
The Fund issued three 10-year, 10% notes to Synergy Equity, LLC:
- USD7,500,000 maturing on October 10, 2017, issued in 2007;
- USD2,875,000 maturing on December 3, 2017, issued on 2007;
- USD3,200,000 maturing on January 28, 2018, issued in 2008.

These loans are secured by a Stock Loan Agreement between Synergy Equity, LLC and Synergy Acceptance Corp., accrue interest at 10% per annum, and are payable in full on the maturity date. For the year ended December 31, 2008 the Fund earned an amount of USD1,333,500 (2007: USD191,111) in interest on these notes. Interest receivable on these notes at December 31, 2008 was USD1,524,611. Subsequent to December 31, 2008, these notes were repaid in full together with accrued interest.

### Corporate Resource Advisors, Inc.
Based on an agreement with Corporate Resources Advisors, Inc. (the "Consultant") dated June 11, 2008, the Investment Manager has retained the Consultant to provide consulting services to the Fund's auto division. The term of this agreement was for six months and the consulting fees are based on industry standard rates. As per December 31, 2008, consulting fees earned by the Consultant amounted to USD93,333.

## (8)  Personnel

The Fund had no direct employees during the years ended December 31, 2008 and 2007

Exhibit D

# Synergy Acceptance Corporation
## Balance Sheet
### As of June 30, 2007

|  | Jun 30, 07 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| CUBE PAYMENT ACCOUNT | 36,286.99 |
| 1000-00 · BNG - | 248,765.35 |
| 1005-00 · Boston Asset Account | 57,582.68 |
| 1045-00 · Petty Cash - Repo Dept | -5.00 |
| 1055-00 · Petty Cash Account | 148.75 |
| 1065-00 · SAC Auto Loan Fund Account | 823,272.80 |
| **Total Checking/Savings** | 1,166,051.57 |
| **Accounts Receivable** | |
| 1200-00 · Accounts Receivable | |
| 1200-05 · American Pegasus Auto Loan Fund | |
| 1200-30 · Payment Processing Fee Invoices | 20,263.99 |
| Total 1200-05 · American Pegasus Auto Loan Fund | 20,263.99 |
| 1200-45 · Clear Skies (GAP Ins) | 73,232.55 |
| Total 1200-00 · Accounts Receivable | 93,496.54 |
| **Total Accounts Receivable** | 93,496.54 |
| **Other Current Assets** | |
| Advance To Synergy Motor | 219,650.36 |
| Loan to Access Atlant Limousine | 240.94 |
| 1310-00 · BNG CD | 25,000.00 |
| 1350-00 · Employee Advance | |
| 1350-10 · Atosha N. Hanley | 220.00 |
| 1350-30 · Laura Bennett | 150.00 |
| 1350-45 · Wendi Brantley | 50.48 |
| Total 1350-00 · Employee Advance | 420.48 |
| **Total Other Current Assets** | 245,311.78 |
| **Total Current Assets** | 1,504,859.89 |
| **Fixed Assets** | |
| 1400-00 · Accumlated Depreciation | -35,271.44 |
| 1410-00 · Building Improvements | 17,650.17 |
| 1420-00 · Computers and Equipment | 59,986.48 |
| 1430-00 · Furniture and Fixtures | 12,234.19 |
| 1450-00 · Software | 8,543.83 |
| **Total Fixed Assets** | 63,143.23 |
| **Other Assets** | |
| Loan Loss Provision | -124,000.00 |
| Loan to Conyers Auto | 12,633.22 |
| 1500-00 · Auto Loans | |
| Refinance - Down Payment | 431.02 |
| 1500-05 · Loans Purchased - Performing | 1,095,489.33 |
| 1500-15 · Payment Received | -424,211.13 |
| Total 1500-00 · Auto Loans | 671,709.22 |
| 1510-00 · Due From AMP - Repo Expenses | |
| 1510-20 · Commissions Paid on Repo | 11,143.14 |
| 1510-35 · Difference on Loan Balance | 40,616.00 |
| 1510-40 · Forced Place Insurance | 26,918.78 |
| 1510-70 · Locksmith Service | 195.00 |
| 1510-90 · Recovery Expense | 690.00 |
| 1510-95 · Repo Repairs | 17,362.36 |
| 1510105 · Repo Transport | 1,200.00 |
| 1510110 · Sales Tax on Paid on Repo | 3,229.80 |
| 1510-00 · Due From AMP - Repo Expenses - Other | 670,493.13 |
| Total 1510-00 · Due From AMP - Repo Expenses | 771,848.21 |
| 1520-00 · Due From Boston Asset | 7,225.99 |
| **Total Other Assets** | 1,339,416.64 |
| **TOTAL ASSETS** | 2,907,419.76 |

# Synergy Acceptance Corporation
## Balance Sheet
### As of June 30, 2007

|  | Jun 30, 07 |
|---|---:|
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2030-00 · Accounts Payable (Synergy) | 101,334.48 |
| 2039-00 · AP to be Researched | -85,527.47 |
| **Total Accounts Payable** | 15,807.01 |
| **Other Current Liabilities** | |
| 2040-00 · Auto Loan Payments Payable | |
| 2040-05 · American Pegasus Payable | 1,817,442.25 |
| 2045-00 · Boston Asset Payable | 77,339.53 |
| 2055-00 · Cube Account Payable | 13,426.85 |
| **Total 2040-00 · Auto Loan Payments Payable** | 1,908,208.63 |
| 2065-00 · Boston Asset Advance-Loan Purch | 4,741.59 |
| 2090-00 · Provision for GAP Payments | 48,732.97 |
| 2100-00 · Unearned Discounts | 325,586.94 |
| **Total Other Current Liabilities** | 2,287,270.13 |
| **Total Current Liabilities** | 2,303,077.14 |
| **Long Term Liabilities** | |
| **Clear Skies Holding Company** | |
| Clear Skies Holding 7/15/07 | 5,096,940.00 |
| Clear Skies Holding Due 1/15/08 | 4,747,150.00 |
| Clear Skies Holding Due 6/30/08 | 4,747,150.00 |
| Clear Skies Holding Due 6/30/09 | 4,747,150.00 |
| **Total Clear Skies Holding Company** | 19,338,390.00 |
| Delores Settles Income Account | 63,178.71 |
| Paul E Hair Income Account | 25,000.00 |
| Robert Pyne Income Acct | 102,000.00 |
| **Unsecured Notes Due in 2007** | |
| Elda Ferrr Guerra 11/24/07 | 100,000.00 |
| J.W. Floyd Monthly 8/9/07 | 50,000.00 |
| Juanita Shrader 8/2/07 | 30,000.00 |
| Lillian Ginn 8/12/07 | 25,000.00 |
| Lisa Harrison 8/18/07 | 15,000.00 |
| Susan B. Hitchcock 12/13/2007 | 28,000.00 |
| **Total Unsecured Notes Due in 2007** | 248,000.00 |
| **Unsecured Notes Due in 2008** | |
| Ann R. Wooten 10/28/08 | 167,143.69 |
| Barry Neumann 5/31/2008 | 50,000.00 |
| Barry Neumann 9/1/08 | 50,000.00 |
| Barry Neumann 9/20/08 | 50,000.00 |
| Beulah P. Turner 8/19/2008 | 30,062.49 |
| Charles Bach 8/29/08 | 44,122.50 |
| Charles R. Bach 9/28/08 | 98,983.98 |
| Cheryl Allen 8/25/08 | 54,760.61 |
| Cheryl Allen 8/25/98 | 25,000.00 |
| Edward Ozorowski 8/25/2008 | 50,000.00 |
| Edward Ozorowski 9/28/08 | 46,206.81 |
| Elizabeth Daugherty 11/04/08 | 32,500.00 |
| Eloise Beverly 9/12/2008 | 50,000.00 |
| Evelyn Watson 10/04/08 | 31,892.50 |
| Helen Jeffcoat 10/10/08 | 25,359.04 |
| Hubert & Lucy Keller 9/7/08 | 75,000.00 |
| J.W. Floyd Monthly 9/6/08 | 125,000.00 |
| James Smalley 9/1/08 | 30,000.00 |
| James T. Hair 7/1/2008 | 25,000.00 |
| James Turner 8/25/08 | 20,000.00 |
| Janet Dobbs 11/15/08 | 65,000.00 |
| Jerry Walston 10/04/08 | 40,933.36 |
| Jerry Walston 11/30/08 | 36,000.00 |
| Jerry Walston 12/8/08 | 40,000.00 |
| John & Judith Reliford 8/25/08 | 120,250.00 |
| Joyce Wahlrab 9/07/08 | 48,000.00 |
| Joyce Wahlrab 9/28/08 | 54,283.62 |

# Synergy Acceptance Corporation
# Balance Sheet
### As of June 30, 2007

|  | Jun 30, 07 |
|---|---|
| Judith Reliford 10/3/08 | 25,000.00 |
| Judith Reliford 8/25/08 | 70,000.00 |
| Judith Reliford 9/28/08 | 15,303.75 |
| Leroy Bates 9/1/2008 | 25,000.00 |
| Lillian Ginn 8/19/08 | 25,000.00 |
| Margaret Ozorowski 9/30/08 | 44,857.96 |
| Michael Tubb Ford 12/6/08 | 34,976.80 |
| Otto Wahlrab 9/07/08 | 131,000.00 |
| Paul Bibb 10/28/08 | 24,784.08 |
| Paul E. Hair 9/29/08 | 25,000.00 |
| R. Leroy Allen 10/04/08 | 172,091.21 |
| R. Leroy Allen 8/25/08 | 119,071.43 |
| Robert E. Neuman 9/7/08 | 15,000.00 |
| Robert Neuman 7/1/2008 | 55,000.00 |
| Robert Neuman 9/29/08 | 25,000.00 |
| Sara Catherine Ford 11/30/08 | 39,901.95 |
| Stephen Krasinski 10/06/08 | 82,926.15 |
| Teresa O'Sullivan 8/20/2008 | 150,000.00 |
| Virginia E. Bibb 11/8/08 | 26,990.50 |
| William Beverly 9/12/08 | 50,000.00 |
| William L. Little 11/4/08 | 50,750.00 |
| William Little 12/6/08 | 42,853.22 |
| William Little 5/13/08 | 100,000.00 |
| William Rumer 11/16/08 | 33,450.29 |
| Willie & Lucille Benton 8/2/08 | 26,000.00 |
| Yves Bernard Martin 2/9/2008 | 200,000.00 |
| **Total Unsecured Notes Due in 2008** | **3,095,455.94** |
| Unsecured Notes Due In 2009 |  |
| Catherine G. Catledge 8/7/09 | 100,000.00 |
| Clines, Joe or Foye 10.4.09 | 115,000.00 |
| J.W. & Betty Floyd 11/14/09 | 110,000.00 |
| Joe Clines 9/19/09 | 125,000.00 |
| John Timmons 10/8/09 | 26,031.02 |
| Kathryn Costello 9/17/09 | 91,770.71 |
| R. Allan Spanjer 1/1/09 | 50,000.00 |
| Willard Watson 9/21/09 | 64,911.27 |
| **Total Unsecured Notes Due In 2009** | **682,713.00** |
| Unsecured Notes Due in 2010 |  |
| Elizabeth Daugherty 2/28/2010 | 25,000.00 |
| Elizabeth Daugherty 4/1/2010 | 52,783.49 |
| J.W. & Betty Floyd 4/10/2010 | 50,000.00 |
| Lebron Junior Reagan 1/18/2010 | 41,981.81 |
| Martha Reagan 1/18/2010 | 46,221.19 |
| Nancy Gray 2/16/2010 | 50,000.00 |
| Rosita Roher 2/12/2010 | 25,000.00 |
| Shirley Upchurch 1/17/2010 | 94,818.53 |
| Thomas Kelley 1/19/2010 | 96,200.00 |
| Willie Lee Benton 1/17/2010 | 10,000.00 |
| **Total Unsecured Notes Due in 2010** | **492,005.02** |
| **Total Long Term Liabilities** | **24,046,742.67** |
| **Total Liabilities** | **26,349,819.81** |
| Equity |  |
| 3010-00 · Synergy Equity, LLC. | 11,610.00 |
| 3025-00 · Retained Earnings | -18,390,392.75 |
| Net Income | -5,063,617.30 |
| **Total Equity** | **-23,442,400.05** |
| **TOTAL LIABILITIES & EQUITY** | **2,907,419.76** |

# Synergy Acceptance Corporation
# Profit & Loss
### January through June 2007

|  | TOTAL |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| Check by Phone Fee Revenue | 2,741.95 |
| Late Fee Income | 0.00 |
| SAC Miscellaneous Fees | 0.00 |
| **4000-00 · Auto Loan Sales** | |
| 4000-10 · American Pegasus Loan Sales | 22,277,608.26 |
| 4000-20 · Boston Asset Loan Sales | 345,258.41 |
| 4000-25 · Cube Account Loan Sales | 34,838.01 |
| **Total 4000-00 · Auto Loan Sales** | 22,657,704.68 |
| 4010-00 · Credit Card Fee Revenue | 2,587.72 |
| 4015-00 · Discount Income | 0.00 |
| 4020-00 · Floor Plan Revenue | 700.00 |
| 4040-00 · Insufficient Fund Fee Revenue | 2,620.00 |
| 4065-00 · Payment Processing Revenue | 20,263.99 |
| 4090-00 · Warranty Revenue | 33,300.72 |
| 4095-00 · Interest Revenue | 15,793.19 |
| **Total Income** | 22,735,712.25 |
| **Cost of Goods Sold** | |
| 4500-00 · Auto Loan Cost Account | 19,063,280.89 |
| **4525-00 · GPS Units Supply** | |
| 4530-00 · GPS Unit Installation (labor) | 34,985.00 |
| 4525-00 · GPS Units Supply - Other | 695,060.00 |
| **Total 4525-00 · GPS Units Supply** | 730,045.00 |
| 4550-00 · Warranty Purchase | 491,383.68 |
| **Total COGS** | 20,284,709.57 |
| **Gross Profit** | 2,451,002.68 |
| **Expense** | |
| Gifts | 292.54 |
| 5010-00 · Advertising | 11,742.89 |
| 5020-00 · Carfax history report | 3,663.89 |
| 5040-00 · Compliance Renewal | 137.80 |
| **5045-00 · Computer Expense** | |
| 5045-05 · Server Lease | 1,785.98 |
| 5045-10 · Software | 2,569.86 |
| 5045-00 · Computer Expense - Other | 1,511.63 |
| **Total 5045-00 · Computer Expense** | 5,867.47 |
| 5050-00 · Computer Service | 4,910.53 |
| 5055-00 · Consulting Fee | 6,500.00 |
| 5070 · Copier/Equipment Lease | 6,165.20 |
| 5080-00 · Credit Reports -Equifax | 73,658.87 |
| 5105-00 · Employee Bonus | 35,405.68 |
| 5110 · Employment Screening | 659.60 |
| 5120 · Filing Fees | 1,369.00 |
| 5125 · Fines and Penalties | 1,000.00 |
| 5130-00 · Forced Placed Insurance | 93,151.70 |
| 5145-00 · Fuel Expense | 1,128.27 |
| 5150-00 · GAP Claims | -500.00 |
| **5155-00 · Health Insurance** | |
| 5155-05 · AFLAC | 5,108.57 |
| 5155-20 · United Health Care Coverage | 71,926.06 |
| 5155-00 · Health Insurance - Other | 0.00 |
| **Total 5155-00 · Health Insurance** | 77,034.63 |

# Synergy Acceptance Corporation
## Profit & Loss
### January through June 2007

|  | TOTAL |
|---|---|
| 5160-00 · Incentive Program for Dealers | 34,480.93 |
| 5160 · GPS Service Fees (Air Time) | 28,138.00 |
| 5190-00 · Lawn Care | 615.00 |
| 5200-00 · Loan Loss from NVI | 130,000.00 |
| 5205-00 · Loan Loss Int Receivable Smith | 4,576.15 |
| 5210-00 · Loan Loss Int ReceivableTorchia | 4,278.24 |
| 5220-00 · Loan Loss to Dun Rite Automotiv | 545,216.00 |
| 5225-00 · Loan Loss to Global Gap | 53,181.87 |
| 5230-00 · Loan Loss to Jim Torchia | 88,898.83 |
| 5235-00 · Loan Loss to Rob Smith | 50,331.02 |
| 5240-00 · Loan Loss to Synergy Motor Co | 4,457,623.30 |
| 5245-00 · Loss of Cube Receivable | 48,297.21 |
| 5265-00 · Mileage | 451.05 |
| 5275-00 · Monthly -Avantage Subscription | 55.34 |
| 5285-00 · Nonemployee Compensation | 600.00 |
| 5295-00 · Office Cleaning | 3,850.00 |
| 5305-00 · Office Supplies | 41,780.57 |
| 5310-00 · Other Taxes | 8,150.01 |
| 5315-00 · Parking Expense | 8.00 |
| 5320-00 · Payroll Processing Charges | 2,580.10 |
| 5325-00 · Payroll Tax Expense | 145,694.27 |
| 5330-00 · Penalties (Taxes) | 1,277.00 |
| 5335-00 · Pest Control | 480.00 |
| 5365-00 · Recovery Service | 1,282.85 |
| 5380-00 · Repo Expense | |
|    5380-05 · Non-Reimburseable EXP for AMP | -36,888.80 |
|    5380-00 · Repo Expense - Other | -23,780.86 |
| Total 5380-00 · Repo Expense | -60,669.66 |
| 5405-00 · Software Lease | 5,560.82 |
| 5445-00 · Telephone Repair/Install | 12,257.65 |
| 5455-00 · Title Expense | 2,661.46 |
| 5465-00 · Uniforms | 5,532.54 |
| 5475-00 · Reconciliation Discrepancies | 7.66 |
| 5495-00 · Charitable Contributions | 920.00 |
| 5505-00 · Dues and Subscriptions | 3,168.64 |
| 5510-00 · Equipment Rental | 1,678.43 |
| 5515-00 · Insurance | 61,214.60 |
| 5520-00 · Licenses and Permits | 4,930.00 |
| 5525-00 · Miscellaneous | 70.00 |
| 5530-00 · Postage and Delivery | 18,304.80 |
| 5535-00 · Printing and Reproduction | 13,493.82 |
| 5540-00 · Professional Fees | |
|    5540-05 · Accounting Services | 55,705.00 |
|    5540-15 · Legal Fees | 61,787.56 |
| Total 5540-00 · Professional Fees | 117,492.56 |
| 5550-00 · Repairs | |
|    5550-05 · Building Repairs | 846.56 |
|    5550-10 · Computer Repairs | 450.00 |
|    5550-15 · Equipment Repairs | 2,515.61 |
|    5550-00 · Repairs - Other | 3,929.15 |
| Total 5550-00 · Repairs | 7,741.32 |
| 5560-00 · Telephone | |
|    5560-10 · Broadband Card | 195.35 |
|    5560-20 · Cell Phones | 2,413.20 |
|    5560-60 · Windstream | 2,966.36 |
|    5560-00 · Telephone - Other | 36,762.37 |
| Total 5560-00 · Telephone | 42,337.28 |
| 5565-00 · Travel & Ent | |
|    5565-05 · Hotel Accomodations | 156.00 |
|    5565-35 · Entertainment | 599.72 |
|    5565-40 · Meals | 110.00 |
|    5565-45 · Travel | 9,802.29 |
|    5565-00 · Travel & Ent - Other | 274.49 |
| Total 5565-00 · Travel & Ent | 10,944.50 |

# Synergy Acceptance Corporation
## Profit & Loss
### January through June 2007

|  | TOTAL |
|---|---|
| **5570-00 · Utilities** | |
| 5570-10 · Gas and Electric | 3,944.22 |
| 5570-15 · Water | 1,329.44 |
| 5570-00 · Utilities - Other | 40.00 |
| **Total 5570-00 · Utilities** | 5,313.66 |
| **5575-00 · Payroll Expenses** | |
| 5575-23 · Employee Bonus - Collections | 2,522.45 |
| 5575-35 · Marketing Commissions | 52,303.12 |
| 5575-00 · Payroll Expenses - Other | 936,943.37 |
| **Total 5575-00 · Payroll Expenses** | 991,768.94 |
| **6110 · Automobile Expense** | |
| 5480-05 · Matt Bohn - Car Expense | 3,004.80 |
| 6110 · Automobile Expense - Other | 486.81 |
| **Total 6110 · Automobile Expense** | 3,491.61 |
| **6120 · Bank Service Charges** | |
| Merchant Services | 16,940.75 |
| 6120 · Bank Service Charges - Other | 4,871.66 |
| **Total 6120 · Bank Service Charges** | 21,812.41 |
| **6200 · Interest Expense** | |
| Ann Wooten | 8,357.16 |
| Barry Neumann | 3,124.98 |
| Barry Neumann2 | 3,124.98 |
| Barry Neumann3 | 3,124.98 |
| Beulah Turner | 1,503.12 |
| Catherine Catledge | 4,500.00 |
| Charles Bach | 1,985.52 |
| Delores Settles | 3,316.86 |
| Edward Ozorowski | 4,810.38 |
| Elda Ferrer Guerra | 4,500.00 |
| Elizabeth Daugherty | 2,929.16 |
| Elizabeth Daugherty Qualified | 1,253.61 |
| Eloise C. Beverly | 2,374.98 |
| Evelyn Watson | 1,594.62 |
| Helen Jeffcoat Qualified | 1,267.98 |
| Hubert & Lucy Keller | 3,375.00 |
| J.W. & Betty Floyd | 750.00 |
| J.W. & Betty Floyd Interest | 4,950.00 |
| James & Eulah Smalley | 1,500.00 |
| James Hair | 1,249.98 |
| James Turner | 1,000.02 |
| Janet Dobbs | 3,087.48 |
| Jerry Walston | 3,799.98 |
| Jerry Walston3 | 2,046.66 |
| Joe Clines Qualified | 5,625.00 |
| John & Judith Reliford | 6,613.74 |
| John W. Floyd | 7,187.52 |
| John W. Floyd3 | 2,875.02 |
| Joyce Wahlrab | 2,160.00 |
| Joyce Walhrab | 2,714.16 |
| Juanita Shrader | 1,575.00 |
| Judith Reliford | 3,850.02 |
| Kathryn Costello | 4,129.68 |
| Lebron Reagan Floor Plan | 944.58 |
| Leroy Bates | 1,249.98 |
| Lillian Ginn | 1,249.98 |
| Lillian Ginn2 | 1,312.50 |
| Lisa J. Harrison | 675.00 |
| Margaret Ozorowski | 2,242.92 |
| Martha Reagan Floor Plan | 1,097.76 |
| Michael Ford | 1,573.98 |
| Nancy Gray Floor Plan | 1,125.00 |
| Otto Wahlrab | 5,895.00 |
| Paul Bibb | 1,239.18 |
| Paul Hair | 2,499.96 |
| R. Allan Spanjer | 2,250.00 |
| R. Leroy Allen | 8,174.34 |

# Synergy Acceptance Corporation
## Profit & Loss
### January through June 2007

|  | TOTAL |
|---|---|
| Robert and Delores Pyne | 4,590.00 |
| Robert E. Neuman | 1,875.00 |
| Robert E. Neuman 2 | 1,350.00 |
| Robert E. Neuman3 | 1,125.00 |
| Rosita Roher Floor Plan | 562.50 |
| Sarah Catherine Ford | 1,795.56 |
| Steven Krasinksi | 3,835.32 |
| Susan Hitchcock | 1,330.02 |
| Teresa O'Sullivan | 7,500.00 |
| Thomas Kelley Floor Plan | 4,947.90 |
| Virginia Bibb | 1,349.52 |
| Willard Watson | 3,083.28 |
| William & Alice Little | 7,537.50 |
| William Beverly | 2,374.98 |
| William Little Qualified | 2,142.86 |
| William Rumer | 1,756.14 |
| Willie & Lucille Benton | 1,234.98 |
| Willie Lee Benton | 375.00 |
| Yves Bernard Martin | 9,000.00 |
| **Total 6200 · Interest Expense** | **195,553.13** |
| **Total Expense** | **7,439,619.98** |
| **Net Ordinary Income** | **-4,988,617.30** |
| Other Income/Expense | |
| Other Expense | |
| Torchia Draw | 75,000.00 |
| **Total Other Expense** | **75,000.00** |
| **Net Other Income** | **-75,000.00** |
| **Net Income** | **-5,063,617.30** |

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **3025-00 · Retained Earnings** | | | | | | | |
| Closing Entry | 12/31/2006 | | | | | (615,929.62) | (617,908.86) |
| General Journal | 6/30/2007 | AJE 471 | | SAC purchase of 999,400 Shares from SAC | -SPLIT- | (19,338,390.00) | (19,956,298.86) |
| General Journal | 6/30/2007 | AJE 473 | | To right off loan /Sale Agreement | Loan from NVI | 1,779,176.85 | (18,177,122.01) |
| General Journal | 6/30/2007 | AJE 474 | | | 3000-00 · Common Stock | 100.00 | (18,177,022.01) |
| General Journal | 6/30/2007 | AJE 474 | | | 3000-00 · Common Stock | 60,282.26 | (18,116,739.75) |
| General Journal | 6/30/2007 | AJE 499 | | | 3005-00 · Owners Equity | (268,653.00) | (18,385,392.75) |
| General Journal | 6/30/2007 | AJE 594 | | | 1345-00 · Deposits | (5,000.00) | (18,390,392.75) |
| General Journal | 7/1/2007 | **AJE 503** | | | **Loan Loss Provision** | **124,000.00** | **(18,266,392.75)** |
| Check | **8/7/2007** | **Wire** | **Clear Skies Holding Co., LLC** | **Repo Expenses due from AMP Prior to sale of SAC 6/30/07** | **1000-00 · BNG -** | **(829,048.00)** | **(19,095,440.75)** |

*BCC generated this report from SAC's QuickBooks general ledger*

Register: Building
From 01/01/2001 through 04/07/2014
Sorted by: Date, Type, Number/Ref

| Date | Ref. | Payee | Account | Memo | Decrease | C | Increase | Balance |
|------|------|-------|---------|------|----------|---|----------|---------|
| 11/15/2005 | Wire | National Viatical, Inc. G.V.I.P. | Bank of North Georgia OLD | | | | 699,480.75 | 699,480.75 |
| 12/31/2005 | AJE 207 | | -split- | | 226,465.75 | | | 473,015.00 |
| 6/30/2007 | AJE 488 | | 3005-00 · 'Sale of Synergy | | 473,015.00 | | | 0 |

*BCC generated this report from SAC's QuickBooks general ledger*

Exhibit E

1

2                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF GEORGIA
3                            ATLANTA DIVISION

4

AMERICAN PEGASUS SPC,          )
5    ACTING BY AND THROUGH           )
ITS JOINT OFFICIAL            )
6    LIQUIDATORS, STUART             )
SYBERSMA AND MICHAEL          )
7    PENNER,                         )
                               )
8            Plaintiff,         )
                               ) CIVIL ACTION FILE
9        vs.                    )
                               ) NO: 13-CV-03035-WSD
10   THE CLEAR SKIES HOLDING       )
COMPANY, LLC, JAMES A.        )
11   TORCHIA, MARC A.              )
CELELLO, CELELLO LAW          )
12   GROUP, LLC AND JARO,          )
LLC,                          )
13                               )
             Defendants.       )
14

15

16

17

18              DEPOSITION OF JAMES A. TORCHIA
19                     ATLANTA, GEORGIA
20                 THURSDAY, MARCH 27, 2014
21

22

23   REPORTED BY:   TANYA L. VERHOVEN-PAGE,
                      CCR-B-1790
24

25   JOB 72277

Exhibit E - Deposition of James Torchia 3-27-2014 (selected pages only)

1
2  March 27, 2014
3  10:05 a.m.
4
5
6
7
8  Deposition of
9  JAMES A. TORCHIA, held at the offices
10 of Alston & Bird, 1201 West Peachtree
11 Street, Atlanta, Georgia before
12 Tanya L. Verhoven-Page, Certified Court
13 Reporter and Notary Public of the State of
14 Georgia.
15
16
17
18
19
20
21
22
23
24
25

1
2  APPEARANCES OF COUNSEL
3
4  On behalf of the Plaintiff:
5  NATHANIEL PALMER, ESQ.
   Reid Collins & Tsai
6  4301 Westbank Drive
   Building B, Suite 230
7  Austin, Texas 78746
8
9
10 HEATHER BYRD ASHER, ESQ.
   KEVIN HEMBREE, ESQ.
11 Alston & Bird
   One Atlantic Center
12 1201 West Peachtree Street
13 Atlanta, Georgia 30309
14 On behalf of the Defendants:
15
16 MICHAEL QUILLING, ESQ.
   Quilling Selander Lownds Winslett Moser
17 2001 Bryan Street
   Suite 1800
18 Dallas, Texas 75201
19
20
21
22
23
24 ALSO PRESENT: Marc A. Celello, Esq.
25       · · ·

1
2     I N D E X
3
4  WITNESS: JAMES A. TORCHIA
5
6  Examination          Page
7
8  BY MR. PALMER          9
9
10    EXHIBITS:
11 Torchia
   Exhibit   Description   Page
12
13 Exhibit 75   Document bearing
   Bates Stamp Numbers
14 TOR 000527 through
   TOR 000533     16
15
   Exhibit 76   Declaration of
16 James A. Torchia   20
17 Exhibit 77   Document bearing
   Bates Stamp Number
18 AP00002591     37
19 Exhibit 78   Document containing
   pages MSJ Appendix
20 Page 84 through
   Page 93     53
21
   Exhibit 79   Independent Auditor's
22 Report     68
23 Exhibit 80   Document bearing
   Bates Stamp Numbers
24 AP00002624 through
   AP00002628     88
25

1
2     EXHIBITS
3  Torchia
   Exhibit   Description   Page
4
5  Exhibit 81   Document bearing
   Bates Stamp Numbers
6  AP00001548 through
   AP00001549     99
7
   Exhibit 82   Document bearing
8  Bates Stamp Numbers
   AP00002662 through
9  AP00002663     107
10 Exhibit 83   Document bearing
   Bates Stamp Number
11 AP00001527     114
12 Exhibit 84   Document bearing
   Bates Stamp Numbers
13 AP00002664 through
   AP00002665     117
14
   Exhibit 85   Document bearing
15 Bates Stamp Number
   AP00001562     121
16
   Exhibit 86   Document bearing
17 Bates Stamp Number
   AP00002690     123
18
   Exhibit 87   Document bearing
19 Bates Stamp Numbers
   D005901 through
20 D005903     131
21 Exhibit 88   Document bearing
   Bates Stamp Numbers
22 D005323 through
   D005327     135
23
   Exhibit 89   Document containing
24 pages MSJ Appendix
   Page 575 through
25 Page 577     139

Exhibit E - Deposition of James Torchia 3-27-2014 (selected pages only)

EXHIBITS:

| Torchia Exhibit | Description | Page |
|---|---|---|
| Exhibit 90 | Document containing pages MSJ Appendix Page 578 through Page 580 | 139 |
| Exhibit 91 | Synergy Acceptance Corporation Balance Sheet as of June 30, 2007 | 141 |
| Exhibit 92 | Document bearing Bates Stamp Number D005255 | 152 |
| Exhibit 93 | Document bearing Bates Stamp Numbers AP00002855 through AP00002856 | 153 |
| Exhibit 94 | Document bearing Bates Stamp Number AP00001404 | 157 |
| Exhibit 95 | Document bearing Bates Stamp Number AP00002104 | 160 |
| Exhibit 96 | Document bearing Bates Stamp Number AP00002110 | 165 |
| Exhibit 97 | Document bearing Bates Stamp Numbers AP00001627 through AP00001628 | 170 |
| Exhibit 98 | Document bearing Bates Stamp Number AP00002123 | 173 |

EXHIBITS:

| Torchia Exhibit | Description | Page |
|---|---|---|
| Exhibit 99 | Document bearing Bates Stamp Numbers D006543 through D006546 | 184 |
| Exhibit 100 | Document bearing Bates Stamp Number AP00002401 | 187 |
| Exhibit 101 | Document bearing Bates Stamp Numbers AP00001581 through AP00001582 | 191 |
| Exhibit 102 | Document bearing Bates Stamp Number AP00001566 | 198 |
| Exhibit 103 | Document bearing Bates Stamp Number AP00001572 | 200 |
| Exhibit 104 | Document bearing Bates Stamp Numbers TOR 4-0723 through TOR 4-0736 | 208 |

EXHIBITS:

Previously marked Hall

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 18 | Document bearing Bates Stamp Numbers AP00001849 through AP00001878 | 134 |
| Exhibit 19 | Document bearing Bates Stamp Numbers AP00005540 through AP00005543 | 123 |
| Exhibit 27 | Document bearing Bates Stamp Number AP00000370 through AP00080371 | 174 |
| Exhibit 28 | Document bearing Bates Stamp Number AP00005540 | 155 |
| Exhibit 31 | Document bearing Bates Stamp Number AP00001406 through AP00001407 | 178 |

Previously marked Celello

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 62 | Document bearing Bates Stamp Numbers D005292 through D005294 | 169 |

J. TORCHIA

ATLANTA, GEORGIA; THURSDAY, MARCH 27, 2014

10:05 A.M.

Thereupon --

JAMES A. TORCHIA,

called as a witness, having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. PALMER:

Q   Good morning, Mr. Torchia, would you please state your name for the record.

A   James Torchia.

Q   My name is Nathan Palmer. I represent the joint liquidators for American Pegasus. We're going to be talking about Synergy Acceptance in an acquisition, its purchase by Benjamin Chui in 2007, and your relationship with American Pegasus and one of its fund, the American Pegasus Auto Loan Fund.

I plan on using a couple of shortened phrases for some of these funds.

Is it okay if we refer to Synergy Acceptance Corporation as SAC?

A   Sure.

Exhibit E - Deposition of James Torchia 3-27-2014 (selected pages only)

J. TORCHIA

2 Q And if we refer to the American Pegasus
3 Auto Loan Fund as APAL?
4 A Yes.
5 Q Have you ever had your deposition taken
6 before?
7 A Yes.
8 Q How many times?
9 A Three or four.
10 Q What types of cases were those in?
11 MR. QUILLING: You probably need to
12 give him some help on that, Nate.
13 THE WITNESS: I can't remember.
14 BY MR. PALMER:
15 Q Were you a plaintiff or a defendant?
16 A I'm always the defendant.
17 Q A couple of ground rules for today.
18 Since you've had your deposition before, I'm sure
19 you've heard them before, as well.
20 One, please answer audibly so that the
21 court reporter can record what we're saying. Shakes
22 of the head, nods, that sort of thing are not easily
23 recordable.
24 When I ask -- I ask that you let me
25 finish a question before you answer. You may know or

J. TORCHIA

2 think you know what I'm asking, but to give her the
3 chance to get it down on -- recorded, just give her
4 the time to get that done. I will likewise try to
5 give you time to finish answering any question before
6 I move on.
7 And if you need any break today, please
8 just let me know. I'm happy to stop when you need
9 to.
10 You understand that you're testifying
11 under oath today?
12 A Yes.
13 Q You understand that your testimony has
14 the same importance as if you were testifying in
15 front of a jury or a judge?
16 A Yes.
17 Q If you don't understand a question I ask
18 today, please just let me know and I'll try to
19 clarify.
20 A Okay.
21 Q And do you feel okay today?
22 A I feel well. Thank you.
23 Q Have you taken anything that would impair
24 your ability to testify fully and truthfully?
25 A No.

J. TORCHIA

2 Q Is there anything at all preventing you
3 from giving accurate and truthful testimony today?
4 A No.
5 Q And do you have any questions before we
6 start?
7 A No.
8 Q How did you prepare for your deposition
9 today?
10 A I didn't.
11 Q Did you review any documents before?
12 A None.
13 Q All right. I'd like to ask you a few
14 questions about your background.
15 What's your education?
16 A I went to Central Connecticut State
17 College for three years, insurance courses, insurance
18 agent, business courses. That's it.
19 Q Where did you take business courses at?
20 A Central Connecticut State College.
21 Q Did you obtain a degree from there at
22 all?
23 A No.
24 Q Do you have any licenses?
25 A Liquor license.

J. TORCHIA

2 Q Any insurance licenses?
3 A No. I surrendered those when I moved
4 from Florida to Georgia, voluntarily. Nothing was
5 taken from me.
6 Q What's your current occupation or job?
7 A I have many jobs. By day I'm a CEO. I
8 have several companies. And by night I'm a
9 dishwasher in my tavern.
10 Q What companies are you a CEO of?
11 A American Motor Credit, Credit Nation,
12 Credit Nation Auto Sales, Credit Nation Lending
13 Services, Sixes Tavern. I think that's about --
14 covers it.
15 Q Prior to 2007 you were the CEO at Synergy
16 Acceptance Corporation, right?
17 A Yes, sir. Yes.
18 Q And you formed SAC?
19 A Yes, I did.
20 Q Do you recall when you formed it?
21 A 2003, early. It could have been late
22 2002.
23 Q Do you recall why you started that
24 company?
25 A Yes. I was introduced to the auto loan

**4** (Pages 10 to 13)

Exhibit E - Deposition of James Torchia 3-27-2014 (selected pages only)

J. TORCHIA

2 business by a friend of mine that we were coaching
3 hockey with and started to do some research into it
4 and started Synergy Acceptance Corp.
5    Q    Did you have any prior experience in the
6 sub prime auto loan industry at that point?
7    A    No.
8    Q    And what was the idea behind Synergy
9 Acceptance Corporation?
10    A    It was to originate auto loans and
11 service them and grow a company, create jobs.
12    Q    Were you personally a shareholder of
13 Synergy Acceptance Corporation at that point?
14    A    Yes.
15    Q    Do you recall what percentage of the
16 company you owned?
17    A    At the time of forming it, all of it.
18    Q    Were there ever any other shareholders?
19    A    There were a couple, yes.
20    Q    Who were those?
21    A    Rob Smith, Marc Celello, and originally
22 Mike Sweet and Erik Sims. Actually Rob Smith was not
23 an original shareholder. He was given shares after
24 the fact.
25    Q    And do you recall around when these other

J. TORCHIA

2 people acquired shares in the company?
3    A    Right after I formed -- when I formed the
4 company and surrounded myself with people that knew
5 various parts of the business. I don't know if they
6 originally were issued shares right out of the gate.
7 They may have been. But it was shortly after, so I
8 guess that's the same thing. I think David Cagle, my
9 attorney, might have been a shareholder for a little
10 while. Very short time.
11    Q    Did you ever solicit any investors for
12 Synergy Investment Corporation?
13    A    Yes.
14    Q    Do you recall when?
15    A    During the time of 2003 to 2004 --
16 through 2004.
17    MR. QUILLING: Let me ask -- let me
18 ask for a clarification. When you say
19 "investors," do you mean people who
20 invested in the stock of Synergy
21 Acceptance or do you mean people that
22 loaned money to the company?
23    MR. PALMER: Noteholders primarily.
24    MR. QUILLING: I wanted to make
25 sure you weren't talking about people who

J. TORCHIA

2 were buying stock in the company.
3    THE WITNESS: Noteholders were
4 individual investors who raised money I
5 believe on -- it was either reg deed
6 document or an Intrastate Security. I
7 really don't remember. But they were
8 individual investors.
9    (Torchia Deposition Exhibit No. 75
10 was marked for the record.)
11 BY MR. PALMER:
12    Q    Okay. Mr. Torchia, you've been handed
13 Exhibit No. 75.
14    Do you recognize this document?
15    A    I recognize the form of this document.
16    Q    Could you please describe what it is for
17 me?
18    A    It looks like a private placement
19 memorandum that Synergy may have been using at one
20 time to raise money from investors. There were
21 several derivatives of it, so I don't know if this is
22 the exact one or not.
23    Q    But you recall issuing private placement
24 memorandums to seek investments from noteholders?
25    A    Yes.

J. TORCHIA

2    Q    Then if you look at the second page Bates
3 labeled -- the one that ends in 529, sorry, third
4 page in, at the bottom of the page there's a number
5 one. It says "The company has no operating history."
6    A    Uh-huh.
7    Q    It says "It was organized in April 2003
8 and has no operating history."
9    Does that sound correct to you?
10    A    That's correct.
11    Q    Are you still involved in the sub prime
12 auto business right now?
13    A    Yes.
14    Q    How are you involved?
15    A    I own another company that's involved in
16 it.
17    Q    What's the name of that company?
18    A    Credit Nation Lending Services and
19 American Motor Credit.
20    Q    What do those companies do?
21    A    They originate sub prime auto loans and
22 service them.
23    Q    Similar to what Synergy Acceptance
24 Corporation did?
25    A    Yes.

5 (Pages 14 to 17)

Exhibit E - Deposition of James Torchia 3-27-2014 (selected pages only)

J. TORCHIA

1 could only charge people ridiculously low price of
2 14 percent, so we want to charge 29 if we could.
3 Q Would one of those states be California?
4 A We never did any auto loans in
5 California.
6 Q I had another case where we had -- it was
7 a usury claim on some loans people were charging for
8 like audio equipment. People were putting in cars
9 for -- where the actual rate will get to 39 percent,
10 but they had some sort of statute that blocked you.
11 A They do that, and rent the rims now, too.
12 Rent to own. Believe me, I didn't do any usury
13 compare to some of these title loan guys charging 150
14 percent a year title pawn.
15 Q So expanding into other states, what
16 would that entail?
17 A Making sure you had the proper
18 infrastructure in those states, like the repo company
19 setup that we'd have to get, people that would put
20 the tracking devices into the cars in those states,
21 relationships with auctions, so if you had to, you
22 know, sell a car in that state. Relationships with
23 wholesalers.
24 Just a myriad of different things being

J. TORCHIA

1 able to operate in those states. Possibly dealers
2 that you could put the car on to resell. It was
3 always an ongoing process. As much foothold and as
4 much footprint you could have there, the better you
5 were off.
6 Q It sounds like one part of that is
7 arranging the support network to service these loans;
8 is that fair to say?
9 A No. We serviced them from Synergy
10 Acceptance Corp. But if you're going to go higher,
11 the servicing end would be, hey, you know, we need to
12 repossess this car, call up Joe's Towing in Tennessee
13 and tell them to go get it. And we'd call two or
14 three towing truck companies, and the first one to
15 get it gets paid.
16 Q Gotcha.
17 So setting up the network you used to
18 take care of the loans --
19 A Yes.
20 Q -- behind the people.
21 A Yeah, relationships with tow truck
22 companies, storage yards, support systems to install
23 the tracking devices into the cars.
24 Q How would you get loans from the -- I

J. TORCHIA

1 imagine you're not going into those states and
2 setting up these networks if you're not acquiring
3 loans from those states; is that right?
4 A Correct.
5 Q How would you go get those loans in those
6 states?
7 A Marketing reps would go into those states
8 and talk to dealers and contract dealers to do
9 business with our company.
10 Q So you had specific employees you would
11 send out there?
12 A Oh, yeah. Yeah. We had four or five
13 marketing reps that would just fan out into different
14 states and stop at the dealerships, give them a card,
15 talk to them about our programs, sign them up, and
16 then they would submit their applications.
17 Q So in looking at these income and expense
18 statements that we have, your opinion would be that
19 this -- this shows a net loss of $619,000. This is
20 not a fair representation of how SAC's business was
21 doing?
22 A I mean, I'm not going to give an opinion
23 either way. It shows a loss, but that doesn't mean
24 that -- it just doesn't mean we were -- we were

J. TORCHIA

1 losing money, it just means that we were spending and
2 investing and incurring some debt probably to expand
3 our operations.
4 Q So you were taking the income you
5 received and investing it in building a bigger
6 business; is that fair to say?
7 A I was taking the income we received and
8 we were using it to open ancillary businesses and
9 support businesses for Synergy Acceptance Corp. in
10 the form of auto dealerships and repair shops.
11 I need to go to the bathroom.
12 MR. PALMER: All right. Let's take
13 a break.
14 (Whereupon, the proceedings were in
15 recess at 11:38 a.m. and
16 subsequently reconvened at 12:41
17 p.m., and the following proceedings
18 were entered of record:)
19 BY MR. PALMER:
20 Q Mr. Torchia, if you wouldn't mind picking
21 up your declaration real quick, on page six, down on
22 the bottom, we were discussing sort of how you, in
23 this time frame prior to the acquisition, you were
24 sort of expanding into other businesses that were

Exhibit E - Deposition of James Torchia 3-27-2014 (selected pages only)

J. TORCHIA

1    don't remember. I just don't remember. I don't
2    remember. I just don't remember.
3    Q   If you look, this e-mail is dated
4    February 20.
5    A   Okay.
6    Q   And the prior two e-mails that we looked
7    at -- let's go back one more -- I believe it was --
8    Exhibit 80 is February 14th, 2007, and this is one
9    where Ben attached a spreadsheet saying there's
10   $18 million remaining cash in February.
11   A   Okay.
12   Q   So does that help you remember whether or
13   not you were -- with the -- when you're referring to
14   the auto loan cash, is it reasonable to think you
15   were referring back to some of these conversations?
16   A   No. No. It's just not. It's just not.
17   I don't remember what I was thinking at the time, but
18   even if I was, you know -- I really don't remember,
19   but even if I was, so what? I mean, so what?
20   Q   I just want to know what you thought.
21   A   I just don't remember. But even if I
22   was, so what?
23       (Torchia Deposition Exhibit No. 83
24       was marked for the record.)

J. TORCHIA

1    BY MR. PALMER:
2    Q   Mr. Torchia, this is Exhibit 83. Do you
3    recognize this e-mail?
4    A   Yes.
5    Q   And this is an e-mail from you to Ben
6    Chui; correct?
7    A   It looks that way.
8    Q   And, again, you're proposing that -- you
9    say, "I think for the good of the investors and
10   myself and the auto loan fund you should buy Synergy
11   and the repair shops"; is that right?
12   A   That's what it says.
13   Q   And this time, if you look at the fourth
14   set -- fourth text -- it looks like the fourth block
15   of text here, it says, "What I want is $25 million."
16   A   Uh-huh.
17   Q   So the prior e-mail we looked at you said
18   Ben could have it for 12 million; here the price is
19   up to 25 million.
20   A   Yes.
21   Q   Why the increase in price?
22   A   Because I realized it was worth a heck of
23   a lot more after talking to several people about it.
24   Q   Who did you talk to about it?

J. TORCHIA

1    A   Rob Smith, a couple other people that
2    told me this company is worth way more than the
3    original 12 million that I had mentioned.
4    Q   Who is Rob Smith?
5    A   Rob Smith was my partner in Synergy at
6    about 30 percent.
7    Q   And how did you guys -- or what did he
8    tell you that made you believe the company was more
9    valuable?
10   A   Because he was a guy that I brought on
11   right in the beginning because he had -- he had had
12   another finance company that he did millions and
13   millions of dollars with, and I wasn't really -- you
14   know, I didn't really -- I relied on Rob a lot for a
15   lot of expertise. And, you know, we -- we kind of
16   determined three years earnings in the form of
17   fees, you know, gross earnings in the form of fees.
18   I don't think that's an unfair price.
19       MR. CELELLO:  Can we go off the
20   record for a second?
21       MR. PALMER:  Sure.
22       (Whereupon, the proceedings were in
23       recess at 1:20 p.m. and
24       subsequently reconvened at 1:26

J. TORCHIA

1    p.m., and the following proceedings
2    were entered of record:)
3    BY MR. PALMER:
4    Q   So this offer we're looking at, Exhibit
5    83, the price now is 25 million. If you look in the
6    next paragraph it says, "You'll also acquire about
7    2 million of buildings and real estate in the
8    meantime."
9        What were you referring to there?
10   A   I know that it would be the repair shop
11   and the building in Canton, Georgia. Those, for
12   sure. There may have been another repair shop or two
13   that they were going to buy that was in Austell. So
14   there were two or three buildings. I can tell you
15   they're not worth 2 million today.
16   Q   Could you just tell me what the different
17   buildings were for?
18   A   Repair shops and the office building that
19   Synergy was in.
20       (Torchia Deposition Exhibit No. 84
21       was marked for the record.)
22   BY MR. PALMER:
23   Q   If you look at the last page -- this is
24   Exhibit 84 -- you'll see the final e-mail on this

Exhibit F

1

2                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF GEORGIA
3                      ATLANTA DIVISION

4

AMERICAN PEGASUS SPC,        )
5   ACTING BY AND THROUGH      )
    ITS JOINT OFFICIAL         )
6   LIQUIDATORS, STUART        )
    SYBERSMA AND MICHAEL       )
7   PENNER,                    )
                               )
8            Plaintiff,        )
                               ) CIVIL ACTION FILE
9        vs.                   )
                               ) NO: 13-CV-03035-WSD
10  THE CLEAR SKIES HOLDING    )
    COMPANY, LLC, JAMES A.     )
11  TORCHIA, MARC A.           )
    CELELLO, CELELLO LAW       )
12  GROUP, LLC AND JARO,       )
    LLC,                       )
13                             )
             Defendants.       )
14

15

16

17

18            DEPOSITION OF KIMBERLY A. KRUSE
19                  ATLANTA, GEORGIA
20               FRIDAY, MARCH 28, 2014
21

22

23  REPORTER:   TANYA L. VERHOVEN-PAGE,
                CCR-B-1790
24

25  JOB 72278

Exhibit F - Deposition of Kimberly Kruse 3-28-2014 (selected pages only)

March 28, 2014
10:06 a.m.

Deposition of
KIMBERLY A. KRUSE, held at the offices
of Alston & Bird, 1201 West Peachtree
Street, Atlanta, Georgia before
Tanya L. Verhoven-Page, Certified Court
Reporter and Notary Public of the State of
Georgia.

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

NATHANIEL PALMER, ESQ.
Reid Collins & Tsai
4301 Westbank Drive
Building D, Suite 230
Austin, Texas 78746

HEATHER BYRD ASHER, ESQ.
KEVIN HEMBREE, ESQ
Alston & Bird
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309

On behalf of the Defendants:

MICHAEL QUILLING, ESQ.
Quilling Selander Lownds Winslett Moser
2001 Bryan Street
Suite 1800
Dallas, Texas 75201

ALSO PRESENT: Marc A. Celello, Esq.

INDEX

WITNESS: KIMBERLY A. KRUSE

| Examination | Page |
|---|---|
| BY MS. ASHER | 10 |

EXHIBITS:

| Kruse Exhibit | Description | Page |
|---|---|---|
| Exhibit 105 | Subpoena | 14 |
| Exhibit 106 | Document bearing Bates stamp Numbers KRUSE000151 through KRUSE000161 | 26 |
| Exhibit 107 | Document bearing Bates Stamp Number AP00001527 | 70 |
| Exhibit 108 | Document bearing Bates Stamp Number AP00002715 | 91 |
| Exhibit 109 | Document bearing Bates Stamp Number D005983 through D005984 | 95 |
| Exhibit 110 | Synergy Acceptance Corporation Balance Sheet as of May 31, 2007 | 102 |

EXHIBITS:

| Kruse Exhibit | Description | Page |
|---|---|---|
| Exhibit 111 | Synergy Acceptance Corporation Balance Sheet as of June 30, 2007 | 104 |
| Exhibit 112 | Synergy Acceptance Corporation Balance Sheet as of July 31, 2007 | 107 |
| Exhibit 113 | Document bearing Bates Stamp Number AP00002073 | 110 |
| Exhibit 114 | Document bearing Bates Stamp Number AP00001403 | 112 |
| Exhibit 115 | Synergy Acceptance Corporation Balance Sheet as of August 31, 2007 | 114 |
| Exhibit 116 | Document bearing Bates Stamp Number AP00001464 | 117 |
| Exhibit 117 | Synergy Acceptance Corporation Balance Sheet as of September 30, 2007 | 126 |
| Exhibit 118 | Synergy Acceptance Corporation Balance Sheet as of October 15, 2007 | 129 |
| Exhibit 119 | Charles E Hall, Jr. Promissory Note | 140 |

2 (Pages 2 to 5)

Exhibit F - Deposition of Kimberly Kruse 3-28-2014 (selected pages only)

```
 1
 2                    EXHIBITS:
 3      Kruse
        Exhibit     Description      Page
 4
 5      Exhibit 120    Document bearing
                       Bates Stamp Numbers
 6                     KRUSE0075 through
                       KRUSE0150      141
 7
        Exhibit 121    Declaration of
 8                     Kimberly Kruse    157
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2                    EXHIBITS:
 3      Previously
        marked
 4      Hall
        Exhibit     Description      Page
 5
 6      Exhibit 8      Document bearing
                       Bates Stamp Numbers
 7                     AP00005632 through
                       AP00005647     58
 8
        Exhibit 12     Document bearing
 9                     Bates Stamp Numbers
                       AP00003043 through
10                     AP00003049     33
11      Exhibit 14     Stock Purchase
                       Agreement      92
12
        Exhibit 18     Document bearing
13                     Bates Stamp Numbers
                       AP00001849 through
14                     AP00001878     72
15      Exhibit 22     Auto Contracts
                       Pre-Purchase Loan
16                     Origination Fees
                       Agreement      101
17
        Exhibit 48     Original Complaint   12
18
19
20
21
22
23
24
25
```

```
 1
 2                    EXHIBITS:
 3      Previously
        marked
 4      Celello
        Exhibit     Description      Page
 5
 6      Exhibit 51     Document bearing
                       Bates Stamp Numbers
 7                     TOR-E00007105 through
                       TOR-E00007172    60
 8
        Exhibit 60     Document bearing
 9                     Bates Stamp Numbers
                       D005255 through
10                     D005256        99
11      Exhibit 61     Document bearing
                       Bates Stamp Numbers
12                     D005403 through
                       D005404        121
13
        Exhibit 62     Document bearing
14                     Bates Stamp Numbers
                       D005292 through
15                     D005294        125
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2                    EXHIBITS:
 3      Previously
        marked
 4      Torchia
        Exhibit     Description      Page
 5
 6      Exhibit 77     Document bearing
                       Bates Stamp Number
 7                     AP00002591     55
 8      Exhibit 79     Independent Auditor's
                       Report         62
 9
        Exhibit 80     Document bearing
10                     Bates Stamp Numbers
                       AP00002624 through
11                     AP00002628     66
12      Exhibit 81     Document bearing
                       Bates Stamp Numbers
13                     AP00001548 through
                       AP00001549     155
14
15
16
17
18
19
20
21
22
23
24
25
```

TSG Reporting - Worldwide     877-702-9580

Exhibit F - Deposition of Kimberly Kruse 3-28-2014 (selected pages only)

1              K. KRUSE
2      ATLANTA, GEORGIA; FRIDAY, MARCH 28, 2014
3              10:06 A.M.
4
5    Thereupon --
6          KIMBERLY A. KRUSE,
7    called as a witness, having been first duly sworn,
8    was examined and testified as follows:
9
10           EXAMINATION
11    BY MS. ASHER:
12      Q   Please state your name for the record.
13      A   Kimberly Ann Kruse.
14      Q   And, Ms. Kruse, my name is Heather Asher,
15    and I represent the plaintiff in this action.
16       Have you ever been deposed before?
17      A   Yes.
18      Q   How many times?
19      A   I think just once.
20      Q   What type of matter was that?
21      A   It was an SEC matter for Ben Chui.
22      Q   Do you understand that you're going to be
23    answering questions under oath today?
24      A   Yes.
25      Q   Have you taken any medication today?

1              K. KRUSE
2      A   No.
3      Q   Do you feel okay?
4      A   Yes.
5      Q   Is there any reason that you wouldn't be
6    able to testify truthfully today?
7      A   No.
8      Q   And you have been deposed before, but
9    I'll just go back over some of the basic rules of the
10    deposition.
11       The first is that I ask that you answer
12    all the questions verbally, not with any hand
13    gestures so that the court reporter can record your
14    words.
15       Also, please allow me to finish asking
16    questions so she can record the full question, and
17    I'll do the same for you and let you finish your
18    answer before I ask another question.
19       If -- we'll probably break for lunch, but
20    if you need a break before then, just let us know,
21    and we'll take a couple minutes to give you a break,
22    and if I ask any questions that aren't clear to you
23    or you would like additional clarification, please
24    let me know and I'll restate the question.
25      A   Okay.

1              K. KRUSE
2      Q   Are you appearing today in the American
3    Pegasus SPC versus Clear Skies Holding Company, Marc
4    Celello, James Torchia and Jaro, LLC matter?
5      A   Yes.
6      Q   And you have agreed to appear voluntarily
7    today?
8      A   Yes.
9      (Previously marked Hall Deposition
10    Exhibit No. 48 was identified for
11    the record.)
12    BY MS. ASHER:
13      Q   I am going to hand you what has
14    previously been marked as Exhibit 48.
15       Have you seen this document before?
16      A   I've seen it. I don't -- I think I have.
17      Q   Have you ever reviewed it?
18      A   Not in detail.
19      Q   If you look at the middle of the page, it
20    says original complaint, and the caption
21    represents -- references the action that we just
22    discussed.
23       Are you familiar at all with the claims
24    that are outlined in this complaint?
25      A   No, not the exact claims.

1              K. KRUSE
2      Q   Have you reviewed any documents in
3    preparation for today?
4      A   For this specific --
5      Q   For this deposition?
6      THE WITNESS: Was that anything
7    that we reviewed? Is that -- I don't
8    know.
9      MR. QUILLING: Don't --
10      THE WITNESS: Between the
11    bankruptcy --
12      MR. QUILLING: Don't get confused.
13    Her confusion arises out of in
14    preparation with preparing her
15    declaration in the San Francisco case,
16    and she reviewed some documents. She's
17    talking about this for coming here today.
18      What have you reviewed to come here
19    today?
20      THE WITNESS: Nothing.
21    BY MS. ASHER:
22      Q   Okay. And did you receive a subpoena in
23    this matter?
24      A   I believe I did.
25      MR. QUILLING: Are you talking

4 (Pages 10 to 13)

Exhibit F - Deposition of Kimberly Kruse 3-28-2014 (selected pages only)

K. KRUSE

1
2    A   I don't really know their exact -- what
3  they do. I don't really know their specific --
4    Q   What type of work did you do with them?
5    A   I worked with them on getting the policy
6  premiums paid, I believe, if I'm remembering which
7  company that was.
8    Q   Do you remember who your contact people
9  were at that company?
10    A   If I'm remembering correctly, her name
11  was -- I still deal with her today on some things.
12  I'm drawing -- Kedi Chang.
13    Q   Did you work with anyone else at ATC?
14    A   Not that I remember.
15    (Previously marked Hall Deposition
16    Exhibit No. 8 was identified for
17    the record.)
18  BY MS. ASHER:
19    Q   You've been handed what was previously
20  marked as Exhibit 8.
21    Do you recognize this document?
22    A   No.
23    Q   Please turn to the page that has Bates
24  label AP00005640. It's in the middle of the
25  document. If you look under the section that's

---

K. KRUSE

1
2  titled strategy, and if you look at the first
3  paragraph on the right side, it says: The
4  Portfolio's investment objective is to earn a steady
5  return by purchasing subprime auto loans issued in
6  the United States and by selling such loans in the
7  secondary market, and if you look earlier on the
8  first page, the Fund is defined as American Pegasus
9  Auto Loan Fund?
10    A   Yes.
11    Q   Is -- what we just read about the
12  investment objective is that your understanding of
13  American Pegasus -- sorry -- APAL's business?
14    A   Yes.
15    Q   And if you will please turn to the page
16  that's Bates labeled 5641. If you look at the last
17  section where it asks the question "What investment
18  criteria must new positions meet?"
19    I'll give you a minute to just review
20  what is stated on the right.
21    A   Okay.
22    Q   Is that your understanding of what the
23  underwriting criteria was for any loans that you sold
24  to APAL?
25    A   I had not seen this criteria before, and,

---

K. KRUSE

1
2  you know, I didn't underwrite the loans. So that
3  really wasn't -- I didn't have anything to do with
4  the underwriting or the criteria for the loans.
5    Q   What do you know about the underwriting
6  criteria for the loans?
7    A   I did not have the specifics. That was,
8  you know, under Rob Smith's direction with the
9  underwriters.
10    Q   So Rob Smith would have been the primary
11  person who was in charge of figuring out the
12  underwriting requirements?
13    A   Yes, ma'am.
14    Q   Did Mr. Torchia have any position with
15  American Pegasus or APAL?
16    A   No.
17    (Previously marked Celello
18    Deposition Exhibit No. 51 was
19    identified for the record.)
20  BY MS. ASHER:
21    Q   You've been handed what was previously
22  marked as Exhibit 51.
23    Do you recognize this document?
24    A   No.
25    Q   Do you see at the top where it says

---

K. KRUSE

1
2  American Pegasus SPC, and then it goes onto say
3  Offering Memorandum Relating to American Pegasus Auto
4  Loan Fund Segregated Portfolio?
5    A   Yes.
6    Q   Do you see where it's dated July 2006?
7    A   Yes.
8    Q   Please turn to page nine.
9    A   Management, is that the right page?
10    Q   Correct. Do you see at the bottom of
11  page nine where it says James Torchia, the very last
12  line?
13    A   Yes.
14    Q   And if you go onto page ten, it says:
15  James Torchia is Senior Portfolio Manager at American
16  Pegasus. Mr. Torchia leads the firm's asset base
17  securities business with specific responsibilities in
18  the portfolio management of the life settlement and
19  the auto loan divisions.
20    Is that consistent with what you knew
21  Mr. Torchia's position to be with American Pegasus?
22    A   No. No.
23    Q   Did you ever know him to do any work
24  directly on behalf of American Pegasus or APAL?
25    A   No.

Exhibit F - Deposition of Kimberly Kruse 3-28-2014 (selected pages only)

```
1                    K. KRUSE
2       done, but I don't have any personal
3       knowledge of the specific document or the
4       terms or anything in it.
5   BY MS. ASHER:
6       Q    So you might have been on an e-mail where
7   it was an attachment, but you haven't --
8       A    But I didn't read it.
9       Q    -- you haven't reviewed it before?
10      A    Yes.
11      Q    If you could, please, look down at
12  section two. It talks about the purchase price, and
13  it says in that first sentence, the purchase price
14  for each share of the company's common stock shall be
15  $19.35.
16          If you look up at the -- well, actually
17  company isn't defined, but do you know how that
18  purchase price of $19.35 for the stock was
19  determined?
20      A    No.
21      Q    Could you turn to the next page, there is
22  a section three titled additional payments, and it
23  says: No later than August 1, 2007, Purchaser agrees
24  to pay Seller any amounts that were due and owing to
25  Purchaser by American Pegasus Auto Loan Fund, SP, and
```

```
1                    K. KRUSE
2   then it goes onto list some amounts that are owing.
3       Do you see that?
4       A    Yes.
5          (Kruse Deposition Exhibit No. 109
6          was marked for the record.)
7   BY MS. ASHER:
8       Q    You've just been handed what's been
9   marked as Exhibit 109.
10          Do you recognize this document?
11      A    Yes.
12      Q    What is it?
13      A    It's an e-mail from me to Jim, Marc
14  Celello, Ben Chui and Rob Smith.
15      Q    Could you turn to the attachment to that
16  e-mail.
17          Are these the -- do these relate to the
18  same amounts, the amounts in the attachment to this
19  e-mail, that is in Section 3 of the stock purchase
20  agreement that we were just looking at that's Exhibit
21  14?
22      A    Yes.
23      Q    How did you determine these amounts?
24      A    These were the amounts that were showing
25  on the -- you know, in QuickBooks, the balances owed.
```

```
1                    K. KRUSE
2       Q    Do you know what the underlying -- what
3   these amounts were related to?
4       A    Yes.
5       Q    Could you go through and explain that to
6   me.
7       A    The repo/reconditioning fees were
8   incurred at the shop or Jim's repair shop for
9   reconditioning American Pegasus's vehicles that were
10  re-sold. Sales tax and products for repo sales, so
11  on those same vehicles, when they were sold, Synergy
12  paid the sales tax that was due for the sale of those
13  vehicles. The force place insurance that was put on
14  loans that were American Pegasus loans. Synergy
15  incurred the cost and was billing it to -- recouping
16  it from American Pegasus. Difference checks were
17  when a loan was purchased from a dealer and it was
18  calculated incorrectly, and the dealer was owed a
19  difference check between the actual amount and the
20  amount that they had received due to some errors in
21  calculations that were on American Pegasus's loans.
22      Q    Okay. Do you have an idea of how long
23  these amounts have been owed from American Pegasus?
24      A    I can't recall the time frame.
25      Q    And do you recall anyone ever telling you
```

```
1                    K. KRUSE
2   that American Pegasus or APAL disputed these amounts?
3       A    Not that I recall.
4       Q    And if you could, please, turn -- look
5   back on Exhibit 14, which is the stock purchase
6   agreement, and if you'll, look at the signature page
7   which is under Section 13. I think you might be on
8   the -- it's the page right before the promissory
9   note. It says document seven, but it looks like
10  every page says that. It --
11          MR. QUILLING: Do you want the
12          signature on it?
13          MS. ASHER: Yes.
14          MR. QUILLING: She's there.
15  BY MS. ASHER:
16      Q    Do you see under Purchaser, it says
17  Synergy Acceptance Corp. Underneath that it says
18  James A. Torchia, CEO. Was that your understanding
19  of Mr. Torchia's position at this time at Synergy
20  Acceptance Corp?
21      A    Yes.
22      Q    And under Seller, it says The Clear Skies
23  Holding Company, LLC, James A. Torchia, but it's
24  listed as a number. Do you have a knowledge -- did
25  you have knowledge at the time that he was a member
```

Exhibit F - Deposition of Kimberly Kruse 3-28-2014 (selected pages only)

K. KRUSE

2 Q And do you see in the caption where it
3 says that it is in the case of Synergy Acceptance
4 Corp as debtor?
5 A Yes.
6 Q And it has adversary proceeding number
7 12-03156.
8 Do you see that?
9 A Yes.
10 Q Why did you prepare this declaration? In
11 connection with what issue, were you preparing this
12 declaration?
13 A The Synergy Acceptance Corp bankruptcy.
14 Q Please turn to paragraph four. It's on
15 the second page of the declaration. In the second
16 sentence, you state I prepared these summaries from
17 voluminous records, all of which were produced to the
18 trustee through counsel. The summaries were produced
19 to the trustee, as well.
20 What was the purpose of preparing the
21 summaries that you know are attached to this
22 declaration?
23 A They were summaries of all of the loan
24 sales.
25 Q And if you look at the -- at Paragraph

K. KRUSE

2 Number 5 on the next page, it discusses the profit on
3 sale. Can you just explain to me what the profit on
4 sale is?
5 A That is the earnings from the sale of
6 loans.
7 Q And would the profit for sale -- profit
8 on sale does that account for any associated overhead
9 costs?
10 A No, ma'am.
11 Q Any other expenses of Synergy Acceptance
12 Corp -- are any other expenses of Synergy Acceptance
13 Corp associated with the profit on sale number?
14 A No.
15 Q In Paragraph 8, you discuss a sample
16 contract reflecting the sale of auto loans by SAC to
17 APAL.
18 Is that general form similar to what
19 would have been -- what was used in the Smart Move
20 deficiency balance transaction? Is it -- do you know
21 whether or not it is the same form?
22 A I don't know.
23 Q Okay. In Paragraph 15, you discuss the
24 electronic database of QuickBooks.
25 Do you know whether or not you still have

K. KRUSE

2 access to or whether anyone has possession of
3 QuickBook records after 2011?
4 A No. That I do not know who would have
5 that, if anybody. After 2007, those were the
6 computers that would have been in Synergy's buildings
7 and offices that have been --
8 Q Okay. Was this declaration -- was --
9 were there loan summaries that you were discussing --
10 was that in connection with discussing kind of the
11 price that was paid for the purchase of Synergy
12 Acceptance Corp?
13 A No. It was -- it was to show, you know,
14 how many loans Synergy did before the sale. How much
15 volume and revenue was generated, you know, every
16 month.
17 Q Do you have any knowledge of how the
18 purchase price of the Synergy Acceptance Corp -- the
19 sale of Synergy Acceptance Corp, how the purchase
20 price was determined?
21 A No.
22 Q Had you ever been involved with valuing
23 Synergy Acceptance Corp for any other transactions
24 that they entered into?
25 A No.

K. KRUSE

2 MS. ASHER: I think that's it.
3 MR. QUILLING: We'll reserve our
4 questions.

6 (Thereupon, the deposition was
7 concluded at approximately 2:25 p.m.)

13 _____
   KIMBERLY A. KRUSE

16 Subscribed and sworn to before me
17 this_____ day of_____, 2014.
   _____

Exhibit F - Deposition of Kimberly Kruse 3-28-2014 (selected pages only)

Exhibit G

| From: | Benjamin P. Chui, CFA [benchui@americanpegasus.com] |
|---|---|
| Sent: | Thursday, May 24, 2007 11:40 AM |
| To: | Marc Celello |
| Cc: | Nviceo@aol.com; charleshall@cehalljr.com |
| Subject: | RE: Docs ready for review end of Wednesday? |

Marc,
Before we talk about the debt holders, there are other issues I need to clear up with Jim.

In any case, I don't expect Jim to pay out of pocket for the debt investors. I got the list of maturities from your assistant this morning (or your yesterday afternoon). I recognize the cash flow need. We are prepared to handle that within Synergy.

I explained to Jim in the past, forcing us to call the note back right away is not just unwise, but creates a stressful cash flow situation.

I understand his need to be insulated from liability from any default on the debt. That is why he has you. You need to explain to him that he is insulated.

Ben

Benjamin P. Chui, CFA
American Pegasus
benchui@americanpegasus.com
Tel: +1 (415)874-3888
Digital ID/Signature: Upon request


**From:** Marc A. Celello [mailto:mcelello@celello.com]
**Sent:** May 24, 2007 8:59 AM
**To:** 'Benjamin P. Chui, CFA'
**Cc:** Nviceo@aol.com; charleshall@cehalljr.com
**Subject:** RE: Docs ready for review end of Wednesday?

They should be available later today or tomorrow.

I have just spoken to Jim and he wants to clarify that this is a $25M deal including investor liability. The investor liability is $4,737,152.67. There are a few investments that will mature in the next few months. Jim is not planning to renew these and will need to refund a few hundred thousand. We want to ensure that this money and the shortfall of $262,847.40 between the rounded $5M of investor liability and the actual number doesn't come out of his pocket. On another related note, Jim doesn't feel comfortable selling Synergy with any of the current investors still invested. He asked you whether he could send a letter notifying the investors of a material change in ownership to which you declined. In that case, Jim insists that all investors' notes be called at the time of closing to insulate him from liability in the event that something dreadful occur to Synergy after the sale.

Marc A. Celello
**Celello Law Group, LLC**
1170 Peachtree Street, N.E.
Suite 275
Atlanta, Georgia 30309
T: 404-897-6000
F: 404-897-7879
www.celello.com



EXHIBIT 87
WIT: Torschia
DATE: 3/27/14
TANYA PAGE, CCR

Exhibit G - Email correspondence re sale of SAC in 2007

D005901

**Confidentiality Notice:** The information in this message, including any attached files, is confidential and may be proprietary, privileged, or otherwise legally exempt from disclosure. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. Please immediately contact the sender if you have received this message in error. Thank you.

**From:** Benjamin P. Chui, CFA [mailto:benchui@americanpegasus.com]
**Sent:** Thursday, May 24, 2007 11:10 AM
**To:** 'Marc A.Celello'
**Cc:** Nviceo@aol.com; charleshall@cehalljr.com
**Subject:** RE: Docs ready for review end of Wednesday?

Marc,

This looks fine. I don't have a calculator when replying to this email, so I didn't check the math of the note etc. But I understand the flow, and what you are proposing.

This works.

Pls proceed to drafting the docs.

Thanks.

We look forward to reviewing the docs.

Can you pls advise when do you expect the docs to be available?

Thx.

Ben

*Sent from PocketPC

Benjamin P. Chui, CFA
American Pegasus
benchui@americanpegasus.com


**From:** Marc A. Celello <mcelello@celello.com>
**Sent:** Wednesday, May 23, 2007 2:47 PM
**To:** 'Benjamin P. Chui, CFA' <benchui@americanpegasus.com>
**Cc:** Nviceo@aol.com <Nviceo@aol.com>; charleshall@cehalljr.com <charleshall@cehalljr.com>
**Subject:** RE: Docs ready for review end of Wednesday?

I'm thinking out loud here. Let me know what you think of the following structure using the following documents:

1) Synergy Board Action to acquire 600 shares of Common Stock from Rob Smith for $20 per share or $12,000 payable in cash at closing;

2) Shareholder approval by Rob Smith and Clear Skies Holding Company, LLC ("Clear Skies") for acquisition of 600 shares;

3) Stock Purchase Agreement By and Between Smith and Synergy for sale of Smith's shares to Synergy;

4) Synergy Board Action to issue 600 shares to Newco, LLC at $20 per share or $12,000;

2

5) Synergy Board Action to Acquire 999,4000 shares of Common Stock from Clear Skies for $19,988,000 payable as follows $4.997M within ___ days of closing, $4.997M payable on each the 1st, 2nd, and 3rd anniversaries of closing;

6) Shareholder approval by Clear Skies and Newco for acquisition of 999,400 shares;

7) Stock Purchase Agreement By and Between Clear Skies and Synergy for sale of Clear Skies shares to Synergy with integrated note from Synergy to Clear Skies for purchase price;

8) Shareholder Action by Newco to replace Board of Directors;

9) Synergy (New) Board Action to approve compensation package of Rob Smith, retain employees, and retain Celello Law Group, LLC as counsel.

Newco would be sole shareholder of 600 shares of Synergy which are issued and outstanding. Synergy would retain 999,400 of authorized but un-issued shares.


Marc A. Celello
**Celello Law Group, LLC**
1170 Peachtree Street, N.E.
Suite 275
Atlanta, Georgia 30309
T: 404-897-6000
F: 404-897-7879
www.celello.com

**Confidentiality Notice:** The information in this message, including any attached files, is confidential and may be proprietary, privileged, or otherwise legally exempt from disclosure. It is intended solely for the addressee. If you are not the intended recipient, any disclosure, copying, or distribution of the message, or any action or omission taken by you in reliance on it, is prohibited and may be unlawful. Please immediately contact the sender if you have received this message in error. Thank you.


**From:** Benjamin P. Chui, CFA [mailto:benchui@americanpegasus.com]
**Sent:** Tuesday, May 22, 2007 11:03 PM
**To:** mcelello@celello.com
**Subject:** Docs ready for review end of Wednesday?

Marc,
Will the docs be ready for review by the end of Wednesday your time?

Ben

Benjamin P. Chui, CFA
American Pegasus
benchui@americanpegasus.com
Tel: +1 (415)874-3888
Digital ID/Signature: Upon request

3