KIEVE LAW OFFICES
  Loren Kieve (Bar No. 56280)
  lk@kievelaw.com
5A Funston Avenue
The Presidio of San Francisco
San Francisco, California  94129-1110
Telephone:          (415) 364-0060
Facsimile:          (435) 304-0060

FOX ROTHSCHILD LLP
  Michael A. Sweet (Bar No. 184345)
  msweet@foxrothschild.com
  Dale L. Bratton (Bar No. 124328)
  dbratton@foxrothschild.com
235 Pine Street, 15th Floor
San Francisco, California 94104
Telephone:          (415) 364-5540
Facsimile:          (415) 391-4436

Counsel for plaintiff E. Lynn Schoenmann,
Trustee of the Bankruptcy Estate of
Synergy Acceptance Corporation

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 11-31712 HLB |
| SYNERGY ACCEPTANCE CORPORATION, Debtor. | Chapter 7 |
| ----------------------------------------------------- | |
| E. LYNN SCHOENMANN, Trustee of the Bankruptcy Estate of Synergy Acceptance Corporation | Adversary Proceeding No.: 12:-03156 HLB |
| Plaintiff, | DECLARATION OF LOREN KIEVE IN SUPPORT OF THE TRUSTEE'S MOTION TO STRIKE THE DECLARATION OF KIMBERLY KRUSE |
| vs. | |
| JAMES A. TORCHIA, et al., | |
| Defendants | Date:  May 8, 2014 Time:  10:00 a.m. |

Loren Kieve declares as follows:

1. I am counsel for the plaintiff E. Lynn Schoenmann (the "Trustee") in this action.

2. I have personal knowledge of the facts set forth in this declaration. If called to testify as a witness, I could and would testify competently to these facts under oath.

3. In her declaration (ECF Doc. No. 195) supporting the Defendants' Opposition to the Trustee's Motion for Summary Judgment as well as the Defendants' Cross-Motion for Summary Judgment, Ms. Kruse states that:

> 16. I was a custodian of records for SAC throughout my employment as Chief Financial Officer. The voluminous auto loan sale documents and the Quickbooks database and the exhibits identified as Exhibits 6~8. 12, 18, 32, and 37 in the Appendix to Defendants' Motion for Summary Judgment <u>are true and correct copies of the original records kept by SAC in the regular course of its business,</u> and it was in the regular course of business of SAC for an employee or representative of SAC with knowledge of the information contained in the records to record and transmit or receive such information for inclusion in the business records of SAC. The records were made or received at or near the time or reasonably soon thereafter by persons with knowledge of the events described therein. [Emphasis added.]

4. Exhibits 6-8 were prepared by Ms. Kruse for this litigation, as she recites in ¶ 4 of her declaration. They therefore cannot be "true and correct copies of the original records kept by SAC in the regular course of its business."

5. Exhibit 12 appears to be partial excerpts from a bank statement of some form. Because they are incomplete they cannot be "true and correct copies of the original records kept by SAC in the regular course of its business."

6. Exhibit 18 appears to be another excerpt from a bank statement. It, too, cannot be a "true and correct cop[y] of the original records kept by SAC in the regular course of its business."

7. The documents contained in Exhibit 37 indicate that they are bills of some form, for sundry accounts, from GreatAmerica Leasing Corporation ("Great America"). They appear to be incomplete.

8. Contrary to Ms. Kruse's sworn declaration, the Exhibit 37 documents are not "true and correct copies of the original records kept by SAC in the regular course of its

1

business." Rather they are parts of larger groups of documents. These documents bear document production numbers GAFS000650 to GAFS000656, then skip to GAFS000502 to GAFS000512, then skip to GAFS000346 to GAFS000375, and then skip to GAFS000150 to GAFS000175. There is no explanation for the missing document numbers.

9. Attached as Exh. A to this declaration is a copy of the letter dated February 13, 2014 from the defendants' counsel to me. It recites that it is enclosing "a disc containing documents produced to Defendants by GreatAmerica Financial Services Corporation." It states that the documents are being produced with "labels GAFS 00001 - GAFS001305."

10. Attached as Exh. B is a copy of the label on the disc that accompanied the February 13, 2014 letter. I reviewed the disc and the documents found in Kruse Exhibit 37 correspond to the documents with the same document numbers in the disc.

11. These documents therefore are not, as Ms. Kruse has sworn under penalty of perjury, "true and correct copies of the original records kept by SAC in the regular course of its business." They did not come from SAC files or records and have not been properly authenticated from any source.

12. Contrary to the statement in the February 13, 2014 letter that "[i]t appears that these documents have already been produced to in this litigation," I am not aware that they were ever produced before they arrived along with that letter some two months after the close of discovery.

13. Attached as Exh. C are excerpts from the deposition given by Ms. Kruse on March 28, 2014 in the Georgia *American Pegasus* litigation.

14. Attached as Exh. D are excerpts from the deposition given by defendant Torchia on March 27, 2014 in the Georgia *American Pegasus* litigation.

I declare under penalty of perjury that the foregoing is true and correct.

2

1    Executed on April 17, 2013

                                                       Loren Kieve

3

# Exhibit A

# QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER

A PROFESSIONAL CORPORATION
ATTORNEYS AND COUNSELORS
2001 BRYAN STREET, SUITE 1800
DALLAS, TEXAS 75201

BRITT McCLUNG
bmcclung@qslwm.com

TELEPHONE: (214) 871-2100
TELEFAX: (214) 871-2111

February 13, 2014

**_Via Federal Express #7979 0456 3662_**
Loren Kieve
Kieve Law Offices
5A Funston Avenue
The Presidio of San Francisco
San Francisco, California 94129-1110

Re:  *E. Lynn Schoenmann, Bankruptcy Trustee, v. James Torchia, et al.*
Adversary Proceeding No. 12-3156 HLB

Dear Mr. Kieve:

Enclosed is a disc containing documents produced to Defendants by GreatAmerica Financial Services Corporation. It appears that these documents have already been produced to you in this litigation; however, as we have not been able to confirm this production, we are now producing these documents with labels GAFS 000001 - GAFS 001305 out of an abundance of caution. Please contact my office if you have any problems retrieving the enclosed documents.

Sincerely,

Britt McClung

Enclosure
5487.0000

4838-8115-6888, v. 1

# Exhibit B



E. Lynn Schoenmann, Bankruptcy Trustee,
v. James Torchia, et al.
Northern District of California, San Francisco Division

QSLWM

2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100

**Documents produced by Defendants**
**GAFS000001 – GAFS001305**

February 13, 2014

# Exhibit C

1

2          IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
3                    ATLANTA DIVISION

4

AMERICAN PEGASUS SPC,      )
5   ACTING BY AND THROUGH     )
    ITS JOINT OFFICIAL        )
6   LIQUIDATORS, STUART       )
    SYBERSMA AND MICHAEL      )
7   PENNER,                   )
                              )
8              Plaintiff,     )
                              ) CIVIL ACTION FILE
9          vs.                )
                              ) NO: 13-CV-03035-WSD
10  THE CLEAR SKIES HOLDING   )
    COMPANY, LLC, JAMES A.    )
11  TORCHIA, MARC A.          )
    CELELLO, CELELLO LAW      )
12  GROUP, LLC AND JARO,      )
    LLC,                      )
13                            )
               Defendants.    )
14

15

16

17

18          DEPOSITION OF KIMBERLY A. KRUSE
19                  ATLANTA, GEORGIA
20              FRIDAY, MARCH 28, 2014
21

22

23  REPORTER:  TANYA L. VERHOVEN-PAGE,
               CCR-B-1790
24

25  JOB 72278

Case: 12-03156   Doc# 211   Filed: 04/17/14   Entered: 04/17/14 18:34:24   Page 10 of 22

March 28, 2014
10:06 a.m.

Deposition of
KIMBERLY A. KRUSE, held at the offices
of Alston & Bird, 1201 West Peachtree
Street, Atlanta, Georgia before
Tanya L. Verhoven-Page, Certified Court
Reporter and Notary Public of the State of
Georgia.

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

NATHANIEL PALMER, ESQ.
Reid Collins & Tsai
4301 Westbank Drive
Building B, Suite 230
Austin, Texas 78746

HEATHER BYRD ASHER, ESQ.
KEVIN HEMBREE, ESQ.
Alston & Bird
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309

On behalf of the Defendants:

MICHAEL QUILLING, ESQ.
Quilling Selander Lownds Winslett Moser
2001 Bryan Street
Suite 1800
Dallas, Texas 75201

ALSO PRESENT: Marc A. Celello, Esq.
- - -

I N D E X

WITNESS: KIMBERLY A. KRUSE

Examination                    Page

BY MS. ASHER                   10

EXHIBITS:

Kruse
Exhibit      Description      Page

Exhibit 105    Subpoena          14
Exhibit 106    Document bearing
               Bates stamp Numbers
               KRUSE000151 through
               KRUSE000161       26

Exhibit 107    Document bearing
               Bates Stamp Number
               AP00001527        70

Exhibit 108    Document bearing
               Bates Stamp Number
               AP00002715        91

Exhibit 109    Document bearing
               Bates Stamp Number
               D005983 through
               D005984           95

Exhibit 110    Synergy Acceptance
               Corporation Balance
               Sheet as of
               May 31, 2007      102

EXHIBITS:

Kruse
Exhibit      Description      Page

Exhibit 111    Synergy Acceptance
               Corporation Balance
               Sheet as of
               June 30, 2007     104

Exhibit 112    Synergy Acceptance
               Corporation Balance
               Sheet as of
               July 31, 2007     107

Exhibit 113    Document bearing
               Bates Stamp Number
               AP00002073        110

Exhibit 114    Document bearing
               Bates Stamp Number
               AP00001403        112

Exhibit 115    Synergy Acceptance
               Corporation Balance
               Sheet as of
               August 31, 2007   114

Exhibit 116    Document bearing
               Bates Stamp Number
               AP00001404        117

Exhibit 117    Synergy Acceptance
               Corporation Balance
               Sheet as of
               September 30, 2007  126

Exhibit 118    Synergy Acceptance
               Corporation Balance
               Sheet as of
               October 15, 2007   129

Exhibit 119    Charles E. Hall, Jr.
               Promissory Note    140

2 (Pages 2 to 5)

K. KRUSE

ATLANTA, GEORGIA; FRIDAY, MARCH 28, 2014

10:06 A.M.

Thereupon --

KIMBERLY A. KRUSE,

called as a witness, having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MS. ASHER:

Q   Please state your name for the record.

A   Kimberly Ann Kruse.

Q   And, Ms. Kruse, my name is Heather Asher,

and I represent the plaintiff in this action.

Have you ever been deposed before?

A   Yes.

Q   How many times?

A   I think just once.

Q   What type of matter was that?

A   It was an SEC matter for Ben Chui.

Q   Do you understand that you're going to be

answering questions under oath today?

A   Yes.

Q   Have you taken any medication today?

K. KRUSE

A   No.

Q   Do you feel okay?

A   Yes.

Q   Is there any reason that you wouldn't be

able to testify truthfully today?

A   No.

Q   And you have been deposed before, but

I'll just go back over some of the basic rules of the

deposition.

The first is that I ask that you answer

all the questions verbally, not with any hand

gestures so that the court reporter can record your

words.

Also, please allow me to finish asking

questions so she can record the full question, and

I'll do the same for you and let you finish your

answer before I ask another question.

If -- we'll probably break for lunch, but

if you need a break before then, just let us know,

and we'll take a couple minutes to give you a break,

and if I ask any questions that aren't clear to you

or you would like additional clarification, please

let me know and I'll restate the question.

A   Okay.

K. KRUSE

Q   Are you appearing today in the American

Pegasus SPC versus Clear Skies Holding Company, Marc

Celello, James Torchia and Jaro, LLC matter?

A   Yes.

Q   And you have agreed to appear voluntarily

today?

A   Yes.

(Previously marked Hall Deposition

Exhibit No. 48 was identified for

the record.)

BY MS. ASHER:

Q   I am going to hand you what has

previously been marked as Exhibit 48.

Have you seen this document before?

A   I've seen it.  I don't -- I think I have.

Q   Have you ever reviewed it?

A   Not in detail.

Q   If you look at the middle of the page, it

says original complaint, and the caption

represents -- references the action that we just

discussed.

Are you familiar at all with the claims

that are outlined in this complaint?

A   No, not the exact claims.

K. KRUSE

Q   Have you reviewed any documents in

preparation for today?

A   For this specific --

Q   For this deposition?

THE WITNESS:  Was that anything

that we reviewed?  Is that -- I don't

know.

MR. QUILLING:  Don't --

THE WITNESS:  Between the

bankruptcy --

MR. QUILLING:  Don't get confused.

Her confusion arises out of in

preparation with preparing her

declaration in the San Francisco case,

and she reviewed some documents.  She's

talking about this for coming here today.

What have you reviewed to come here

today?

THE WITNESS:  Nothing.

BY MS. ASHER:

Q   Okay.  And did you receive a subpoena in

this matter?

A   I believe I did.

MR. QUILLING:  Are you talking

Case: 12-03156   Doc# 211   Filed: 04/17/14   Entered: 04/17/14 18:34:24   Page 12 of
22

K. KRUSE

1
2    Q    What was your position with the viatical
3    business?
4    A    When it was just him and I, it was just
5    kind of a jack of all trades, whatever needed to be
6    done.
7    Q    And how were you compensated?  Did you
8    have a salary or ownership?
9    A    At first, it was kind of part-time
10   because it wasn't that busy, and I was paid
11   accordingly, and then when it became full-time, I
12   believe -- I can't remember what the exact starting
13   salary was, but it was probably around 30,000.
14   Q    Can you explain what a viatical business
15   is.
16   A    Yes.
17   Q    What is it?
18   A    It's buying life insurance policies from
19   terminally ill individuals for less than the face
20   value of the policy.
21   Q    How long did you work at National
22   Viatical, or are you still working within that
23   same -- what's considered to be that same company?
24   A    I worked for National Viatical until
25   2007.

K. KRUSE

1
2    Q    And between 1998 and 2007, were you also
3    working at any other companies associated with
4    Mr. Torchia?
5    A    Yes.
6    Q    Which companies are those?
7    A    Synergy Acceptance Corp.
8    Q    Any other companies?
9    A    We may have had -- not that I was working
10   for directly I can think of.
11   Q    Mr. Torchia had other businesses during
12   that time period?
13   A    We had started -- I think -- it was
14   International Viatical but never really -- we
15   incorporated the name, but we never did anything with
16   that company, but that's the only one I can think of.
17   Q    Are you aware of any other companies
18   Mr. Torchia had from 1998 to 2007?
19   A    No, that I can think of.
20   Q    Okay.  So from meeting Mr. Torchia in
21   1998, you've worked at the National Viatical and
22   Synergy Acceptance Corp companies?
23   A    Yes.
24   Q    What year did you start working at
25   Synergy Acceptance Corp?

K. KRUSE

1
2    A    The company was started in 2003.  So
3    that's when I started working -- you know, doing work
4    for that company, but I did not get paid a salary --
5    a separate salary because I was getting a salary from
6    National Viatical, and we were just starting that up.
7    So I was only paid through National
8    Viatical for the first couple of years.
9    Q    When did you start getting paid by
10   Synergy Acceptance Corp?
11   A    I believe it was 2006.
12   Q    When you started working with Synergy
13   Acceptance Corp?
14   A    It may have been 2005.  Sorry.  I think
15   2005.
16   Q    And that's something else I should have
17   mentioned.
18   If you answer a question and later on you
19   remember something else, just let me know.
20   A    Okay.
21   Q    You stated that you started working with
22   Synergy Acceptance Corp in 2003.  Do you recall if
23   you had a title or what that title was when you
24   started working there?
25   A    I had no title.

K. KRUSE

1
2    Q    What were your responsibilities at that
3    time?
4    A    Doing accounts payable, receivable.  Just
5    the general bookkeeping.
6    Q    Was it similar to what you had been doing
7    before at Center Group or at the cable company?
8    A    Yes.
9    Q    What type of business does Synergy
10   Acceptance Corp have?
11   A    A subprime auto loan finance.
12   Q    Had you ever been involved with that type
13   of business before?
14   A    No.
15   Q    Do you know if Mr. Torchia had been
16   involved in that type of business before you guys
17   started the company?
18   A    Not to my knowledge.
19   Q    Do you recall how he got involved in that
20   business or how you guys got involved in that
21   business?
22   A    Not specifically.  He had, you know,
23   developed some relationships, some business contacts,
24   and it developed from that.
25   Q    When you guys were starting the company

Case: 12-03156    Doc# 211    Filed: 04/17/14    Entered: 04/17/14 18:34:24    Page 13 of 22

K. KRUSE

1
2 in 2003, what did you kind of project the benefit to
3 be of getting into that market?
4      A    To grow a company, you know, have a
5 successful business.
6      Q    Did you ever have an ownership interest
7 in Synergy Acceptance Corp?
8      A    No.
9      Q    You stated earlier, after a couple of
10 years, you started getting paid.
11           Do you recall what your salary was when
12 you started getting paid?
13      A    I can give you a ballpark.  I think it
14 was around 110 annually.
15      Q    Did you have an employment agreement at
16 that time?
17      A    No.
18      Q    Did you ever have an employment
19 agreement?
20      A    Yes.
21        (Kruse Deposition Exhibit No. 106
22         was marked for the record.)
23 BY MS. ASHER:
24      Q    You've just been handed what's marked as
25 Exhibit 106.

K. KRUSE

1
2      Q    Do you recognize this document?
3      A    Yes.
4      Q    What is it?
5      A    It is my employment agreement with
6 Synergy Acceptance Corp.
7      Q    Was this one of the documents that you
8 produced pursuant to the subpoena?
9      A    Yes, ma'am.
10      Q    If you could, turn to the second page.
11           Do you see at the top where it is dated
12 January 30th, 2008?
13      A    Yes.
14      Q    At that time, had there ever been a
15 previous employment agreement?
16      A    No.
17      Q    Written employment agreement.
18           Please look down at the numbered section
19 one.  Do you see the language starting on the second
20 line of that paragraph where it says:  Employer
21 hereby employs Employee to serve Employer in the
22 capacity of Chief Financial Officer?
23      A    Yes.
24      Q    Prior to this date of January 30th, 2008,
25 had you been working as a Chief Financial Officer for

K. KRUSE

1
2 Synergy Acceptance Corp?
3      A    No.  I did not have that specific title.
4      Q    What was your -- what were your previous
5 titles?
6      A    I really didn't have a title.  We weren't
7 big on titles.
8      Q    What was the reason for entering into
9 this employment agreement?
10      A    This was under the direction of Charles
11 Hall.  When he came to Synergy Acceptance, he decided
12 that employment agreements should be in place for key
13 employees.
14      Q    And so was it your understanding that
15 your position had changed or any of your
16 responsibilities had changed now that you became the
17 Chief Financial Officer?
18      A    No.
19      Q    If you look at the last -- the last two
20 sentences of that first paragraph -- well, the first
21 paragraph in section one.  It says:  The effective
22 term of this agreement is -- shall be for a period of
23 three years.
24           Did you work there for another three
25 years after this agreement?

K. KRUSE

1
2      A    No.
3      Q    When did you stop working at Synergy
4 Acceptance Corp?
5      A    I was terminated in 2010.
6      Q    What was the reason for the termination?
7      A    Gosh, they gave me a long list of -- that
8 I wasn't performing my duties and they no longer
9 needed my services.
10      Q    Who gave you this?
11      A    Ben Chui handed me the termination.
12      Q    Do you still have a copy of that
13 termination?
14      A    I believe my attorney would have.  I had
15 an attorney that represented me.
16      Q    What's the name of that attorney?
17      A    Can I look in my phone?  I can't remember
18 his name.
19      Q    Sure.
20      A    It's been a while.  Steven Wolfe.
21      Q    And you said before that earlier you
22 hadn't had any official titles, and in this
23 employment agreement, you were given the title of
24 Chief Financial Officer.
25           While you were working at Synergy

K. KRUSE

1 they purchased loans. Can you kind of walk me
2 through some details of that business, like exactly
3 how to -- who are they purchasing loans from, what
4 are the terms?
5     A    Independent dealers -- sometimes they are
6 called buy here/pay here dealers -- need financing.
7 So a customer would come into a dealership,
8 independent dealer, and they don't have the best
9 credit, and they can't, like, get a loan with their
10 bank. So they would send it to us to see if, you
11 know, we would finance that customer.
12     Q    How would you determine whether or not
13 you would finance that customer?
14     A    It would be based on risk; you know,
15 their credit, their job history, their stability,
16 ability to pay.
17     Q    Were there certain underwriting terms
18 that you guys had to follow?
19     A    Yes, ma'am.
20     Q    And where -- where were those
21 underwriting terms set? Was it in a written
22 agreement, or was it something that was understood
23 among the people in the office?
24     A    Rob dealt with the underwriters, and at

K. KRUSE

1 that time, I'm -- you know, they had guidelines that
2 they followed, written guidelines, but they could,
3 you know, based on -- you know, they didn't have to
4 stick to the guidelines.
5         They could say, you know, the term could
6 go a little bit longer if it was a good car or that
7 kind of thing. So there were general guidelines that
8 they followed.
9     Q    What was Mr. Torchia's position in the
10 company?
11     A    He was the president and CEO.
12     Q    On a day-to-day basis, what types of
13 things did he do in the company?
14     A    He would, you know, make the decisions.
15 You know, he would help structure the loans, you
16 know, and approve whether or not they would buy a
17 loan. Sometimes, not on every loan. And he would --
18 he got the investor money, dealt with the investors
19 and the marketing reps and helped, you know, building
20 the company.
21     Q    How often did you interact with
22 Mr. Torchia while you were working at Synergy
23 Acceptance Corp? Beginning from 2003, were you in
24 contact with him daily, weekly?

K. KRUSE

1     A    Every day. We were in the same office.
2     Q    And what types of matters did you guys
3 discuss on a daily basis?
4     A    Usually things like, you know, bills and,
5 you know, loan, sales and just day-to-day operations.
6     Q    Were there any kind of regular reports or
7 anything that you produced on a weekly or monthly
8 basis for the company?
9     A    Only as needed, as they requested them.
10     Q    Did you prepare balance sheets or
11 financial spreadsheets, any type of financial items
12 like that for the company?
13     A    Well, we kept the books in QuickBooks so
14 any time, you know, you could pull a profit and loss
15 or balance sheet. So any time they wanted to look at
16 it, you could just pull it up for any time period.
17     Q    Who maintained those records?
18     A    I did.
19     Q    So if Mr. Torchia said I need to see the
20 financials for 2005, you're the person that he would
21 go to to get that information?
22     A    Yes, ma'am.
23     Q    Is there anyone else that would have
24 access to that information?

K. KRUSE

1     A    We had other people that were assisting
2 at that point when it was getting so big with the
3 posting, you know, the bills and printing out checks,
4 you know, collecting the payments and, you know,
5 reconciling the bank accounts and the deposits and
6 keeping up with, you know, all of that.
7     Q    By around 2006, how many employees would
8 you estimate Synergy Acceptance Corp had?
9     A    2006, maybe 40, 50.
10     Q    Were those employees paid directly by
11 Synergy Acceptance Corp?
12     A    Yes, ma'am.
13     Q    Okay. So that was a part of Synergy
14 Acceptance Corp's overhead?
15     A    Yes.
16     Q    Did Synergy Acceptance Corp also sell
17 loans to other parties?
18     A    Yes.
19     Q    And what companies did they sell loans
20 to?
21     A    Boston Asset Management and Cube
22 Securities.
23     Q    What type of companies are those?
24     A    They were investment firms.

Case: 12-03156   Doc# 211   Filed: 04/17/14   Entered: 04/17/14 18:34:24   Page 15 of 22

K. KRUSE

1
2     Q    And do you see in the caption where it
3 says that it is in the case of Synergy Acceptance
4 Corp as debtor?
5     A    Yes.
6     Q    And it has adversary proceeding number
7 12-03156.
8     Do you see that?
9     A    Yes.
10     Q    Why did you prepare this declaration?  In
11 connection with what issue, were you preparing this
12 declaration?
13     A    The Synergy Acceptance Corp bankruptcy.
14     Q    Please turn to paragraph four.  It's on
15 the second page of the declaration.  In the second
16 sentence, you state I prepared these summaries from
17 voluminous records, all of which were produced to the
18 trustee through counsel.  The summaries were produced
19 to the trustee, as well.
20     What was the purpose of preparing the
21 summaries that you know are attached to this
22 declaration?
23     A    They were summaries of all of the loan
24 sales.
25     Q    And if you look at the -- at Paragraph

K. KRUSE

1
2     Number 5 on the next page, it discusses the profit on
3 sale.  Can you just explain to me what the profit on
4 sale is?
5     A    That is the earnings from the sale of
6 loans.
7     Q    And would the profit for sale -- profit
8 on sale does that account for any associated overhead
9 costs?
10     A    No, ma'am.
11     Q    Any other expenses of Synergy Acceptance
12 Corp -- are any other expenses of Synergy Acceptance
13 Corp associated with the profit on sale number?
14     A    No.
15     Q    In Paragraph 8, you discuss a sample
16 contract reflecting the sale of auto loans by SAC to
17 APAL.
18     Is that general form similar to what
19 would have been -- what was used in the Smart Move
20 deficiency balance transaction?  Is it -- do you know
21 whether or not it is the same form?
22     A    I don't know.
23     Q    Okay.  In Paragraph 15, you discuss the
24 electronic database of QuickBooks.
25     Do you know whether or not you still have

K. KRUSE

1
2     access to or whether anyone has possession of
3 QuickBook records after 2011?
4     A    No.  That I do not know who would have
5 that, if anybody.  After 2007, those were the
6 computers that would have been in Synergy's buildings
7 and offices that have been --
8     Q    Okay.  Was this declaration -- was --
9 were there loan summaries that you were discussing --
10 was that in connection with discussing kind of the
11 price that was paid for the purchase of Synergy
12 Acceptance Corp?
13     A    No.  It was -- it was to show, you know,
14 how many loans Synergy did before the sale.  How much
15 volume and revenue was generated, you know, every
16 month.
17     Q    Do you have any knowledge of how the
18 purchase price of the Synergy Acceptance Corp -- the
19 sale of Synergy Acceptance Corp, how the purchase
20 price was determined?
21     A    No.
22     Q    Had you ever been involved with valuing
23 Synergy Acceptance Corp for any other transactions
24 that they entered into?
25     A    No.

K. KRUSE

1
2     MS. ASHER:  I think that's it.
3     MR. QUILLING:  We'll reserve our
4 questions.
5
6     (Thereupon, the deposition was
7 concluded at approximately 2:25 p.m.)
8
9
10
11
12
    _____
13     KIMBERLY A. KRUSE
14
15
16     Subscribed and sworn to before me
17 this_____ day of_____, 2014.
18     _____
19
20
21
22
23
24
25

# Exhibit D

1

2          IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF GEORGIA
3                   ATLANTA DIVISION

4

    AMERICAN PEGASUS SPC,       )
5   ACTING BY AND THROUGH       )
    ITS JOINT OFFICIAL          )
6   LIQUIDATORS, STUART         )
    SYBERSMA AND MICHAEL        )
7   PENNER,                     )
                                )
8              Plaintiff,       )
                                ) CIVIL ACTION FILE
9          vs.                  )
                                ) NO: 13-CV-03035-WSD
10  THE CLEAR SKIES HOLDING     )
    COMPANY, LLC, JAMES A.      )
11  TORCHIA, MARC A.            )
    CELELLO, CELELLO LAW        )
12  GROUP, LLC AND JARO,        )
    LLC,                        )
13                              )
               Defendants.      )
14

15

16

17

18          DEPOSITION OF JAMES A. TORCHIA
19               ATLANTA, GEORGIA
20          THURSDAY, MARCH 27, 2014

21

22

23  REPORTED BY:  TANYA L. VERHOVEN-PAGE,
                  CCR-B-1790
24

25  JOB 72277

March 27, 2014
10:05 a.m.

Deposition of
JAMES A. TORCHIA, held at the offices
of Alston & Bird, 1201 West Peachtree
Street, Atlanta, Georgia before
Tanya L. Verhoven-Page, Certified Court
Reporter and Notary Public of the State of
Georgia.

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

NATHANIEL PALMER, ESQ.
Reid Collins & Tsai
4301 Westbank Drive
Building B, Suite 230
Austin, Texas 78746

HEATHER BYRD ASHER, ESQ.
KEVIN HEMBREE, ESQ.
Alston & Bird
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309

On behalf of the Defendants:

MICHAEL QUILLING, ESQ.
Quilling Selander Lownds Winslett Moser
2001 Bryan Street
Suite 1800
Dallas, Texas 75201

ALSO PRESENT: Marc A. Celello, Esq.
- - -

I N D E X

WITNESS: JAMES A. TORCHIA

Examination                          Page

BY MR. PALMER                          9

EXHIBITS:

Torchia
Exhibit        Description        Page

Exhibit 75     Document bearing
               Bates Stamp Numbers
               TOR 000527 through
               TOR 000533         16

Exhibit 76     Declaration of
               James A. Torchia    20

Exhibit 77     Document bearing
               Bates Stamp Number
               AP00002591          37

Exhibit 78     Document containing
               pages MSJ Appendix
               Page 84 through
               Page 93             53

Exhibit 79     Independent Auditor's
               Report              68

Exhibit 80     Document bearing
               Bates Stamp Numbers
               AP00002624 through
               AP00002628          88

EXHIBITS:

Torchia
Exhibit        Description        Page

Exhibit 81     Document bearing
               Bates Stamp Numbers
               AP00001548 through
               AP00001549          99

Exhibit 82     Document bearing
               Bates Stamp Numbers
               AP00002662 through
               AP00002663          107

Exhibit 83     Document bearing
               Bates Stamp Number
               AP00001527          114

Exhibit 84     Document bearing
               Bates Stamp Numbers
               AP00002664 through
               AP00002665          117

Exhibit 85     Document bearing
               Bates Stamp Number
               AP00001562          121

Exhibit 86     Document bearing
               Bates Stamp Number
               AP00002690          123

Exhibit 87     Document bearing
               Bates Stamp Numbers
               D005901 through
               D005903             131

Exhibit 88     Document bearing
               Bates Stamp Numbers
               D005323 through
               D005327             135

Exhibit 89     Document containing
               pages MSJ Appendix
               Page 575 through
               Page 577            139

2 (Pages 2 to 5)

EXHIBITS:

| Torchia Exhibit | Description | Page |
|---|---|---|
| Exhibit 90 | Document containing pages MSJ Appendix Page 578 through Page 580 | 139 |
| Exhibit 91 | Synergy Acceptance Corporation Balance Sheet as of June 30, 2007 | 141 |
| Exhibit 92 | Document bearing Bates Stamp Number D005255 | 152 |
| Exhibit 93 | Document bearing Bates Stamp Numbers AP00002855 through AP00002856 | 153 |
| Exhibit 94 | Document bearing Bates Stamp Number AP00001404 | 157 |
| Exhibit 95 | Document bearing Bates Stamp Number AP00002104 | 160 |
| Exhibit 96 | Document bearing Bates Stamp Number AP00002110 | 165 |
| Exhibit 97 | Document bearing Bates Stamp Numbers AP00001627 through AP00001628 | 170 |
| Exhibit 98 | Document bearing Bates Stamp Number AP00002123 | 173 |

EXHIBITS:

| Torchia Exhibit | Description | Page |
|---|---|---|
| Exhibit 99 | Document bearing Bates Stamp Numbers D006543 through D006546 | 184 |
| Exhibit 100 | Document bearing Bates Stamp Number AP00002401 | 187 |
| Exhibit 101 | Document bearing Bates Stamp Numbers AP00001581 through AP00001582 | 191 |
| Exhibit 102 | Document bearing Bates Stamp Number AP00001566 | 198 |
| Exhibit 103 | Document bearing Bates Stamp Number AP00001572 | 200 |
| Exhibit 104 | Document bearing Bates Stamp Numbers TOR 4-0723 through TOR 4-0736 | 208 |

EXHIBITS:

Previously marked Hall

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 18 | Document bearing Bates Stamp Numbers AP00001849 through AP00001878 | 134 |
| Exhibit 19 | Document bearing Bates Stamp Numbers AP00005540 through AP00005543 | 123 |
| Exhibit 27 | Document bearing Bates Stamp Number AP00000370 through AP00000371 | 174 |
| Exhibit 28 | Document bearing Bates Stamp Number AP00005540 | 155 |
| Exhibit 31 | Document bearing Bates Stamp Numbers AP00001406 through AP00001407 | 178 |

Previously marked Celello

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 62 | Document bearing Bates Stamp Numbers D005292 through D005294 | 169 |

J. TORCHIA

ATLANTA, GEORGIA; THURSDAY, MARCH 27, 2014

10:05 A.M.

Thereupon --

JAMES A. TORCHIA,

called as a witness, having been first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. PALMER:

Q    Good morning, Mr. Torchia, would you please state your name for the record.

A    James Torchia.

Q    My name is Nathan Palmer.  I represent the joint liquidators for American Pegasus.  We're going to be talking about Synergy Acceptance in an acquisition, its purchase by Benjamin Chui in 2007, and your relationship with American Pegasus and one of its fund, the American Pegasus Auto Loan Fund.

I plan on using a couple of shortened phrases for some of these funds.

Is it okay if we refer to Synergy Acceptance Corporation as SAC?

A    Sure.

J. TORCHIA

1
2 these add-on products don't put them -- I think at
3 the time we were doing a 20 percent payment to income
4 ratio. So there's always a set of numbers that falls
5 into line.
6          In other words, you know, if the GAP
7 coverage put them at a 20 percent, whatever the
8 number is, payment-to-income ratio, what I mean is
9 their car payment is 25 percent of what their grossly
10 monthly pay is, then you would have to back off or
11 maybe not do the loan or maybe take the warranty
12 GAP -- you know, warranty coverage off it or put the
13 person in a different car. I mean, it's just not in
14 a vanilla box. It's a moving target all the time on
15 every single loan.
16     Q   If you would look, there should be an
17 Exhibit 7 there.
18     A   Okay.
19     Q   Take a look at that real quick.
20     A   Uh-huh.
21     Q   This looks to be a spreadsheet that has
22 the loan sales to American Pegasus in 2006.
23          Does that look right to you?
24     A   It looks like a spreadsheet. I didn't
25 originate these, Nate.

J. TORCHIA

1
2     Q   This was something Kim Kruse put
3 together?
4     A   Yes.
5     Q   Turn to, it looks like, the second page
6 of the spreadsheet.
7     A   Yes.
8     Q   There's sort of in the middle of the page
9 a summary box for American Pegasus and you.
10     A   Uh-huh.
11     Q   And it looks like total profit for 2006
12 was about $2.9 million. Does that correspond with
13 your memory?
14     A   I don't remember. If that's what it
15 says -- Kim Kruse is going to -- you're deposing her
16 tomorrow. You know, I just can't comment on these
17 things with accuracy. She's the one that did it. I
18 mean, I'm not the only guy -- the only guy in this
19 company. There were 60 or 70 employees that did
20 their job. Kim was with me since 1997, so --
21     Q   Does she still work for you?
22     A   She does.
23     Q   The average profit per loan here is about
24 1500 bucks, it appears. And it looks like you sold a
25 total of 1,937 loans to American Pegasus in 2006.

J. TORCHIA

1
2          And from Ms. Kruse's declaration I
3 understand that this $1,500 number for average profit
4 did include the warranty and the GAP coverage
5 expense.
6          For this number that is being calculated
7 here, would that -- when you were determining average
8 profit per loan, were you factoring in Synergy
9 Acceptance Corporation's operating expenses, or is
10 this just a reflection of how much --
11     A   I think that's raw profit.
12          Is that what you're asking me?
13     Q   Yes.
14     A   That's probably raw profit. Again,
15 that's a question for Kim Kruse.
16     Q   Okay. Well, we should ask her.
17     MR. QUILLING: By "raw," do you
18 mean gross?
19     THE WITNESS: I mean that's what we
20 made in -- that was gross profits, yes.
21 BY MR. PALMER:
22     Q   So this is just what you would make on
23 fees, themselves?
24     A   I would say fees and warranties.
25     Q   I meant to include that --

J. TORCHIA

1
2     A   And GAP.
3     Q   -- when I said "fees."
4          And this also has two other companies, it
5 appears, on here, Boston Asset and Cube?
6     A   Uh-huh.
7     Q   Who was Boston Asset?
8     A   It's a company out of Malaysia that was
9 going to start doing some loan origination with us,
10 also.
11     Q   And Cube?
12     A   Cube was an investment type of -- you
13 know, they were tiptoeing into the auto loan -- auto
14 loan asset class. They were out of Russia.
15          I get around, don't I?
16     Q   Malaysia, Russia.
17          It looks like you were charging, on this
18 spreadsheet, 4.5 percent to American Pegasus. It
19 seems to correspond with your memory?
20     A   Uh-huh.
21     Q   And it looks like you were charging
22 3 percent to Cube. Do you recall why there was a
23 lower number for them?
24     A   I don't. It could have been that we --
25 they were paying us some fees or shared in -- we

TSG Reporting - Worldwide    877-702-9580

Case: 12-03156   Doc# 211   Filed: 04/17/14   Entered: 04/17/14 18:34:24   Page 21 of 22

J. TORCHIA

1
2 shared in the profits of the loans. I just don't
3 remember the arrangement.
4       Q    And then if you would look at the next
5 spreadsheet here --
6       A    Again, Kim will answer that question, I'm
7 sure.
8       Q    Okay.
9       A    Okay.
10      Q    This looks to be a spreadsheet for 2007.
11      A    Uh-huh.
12      Q    All the way up, if you turn to the -- it
13 looks like there's a break in the middle, on page
14 three, at June 30th, 2007, and then it continues
15 through September 7th, 2007. I'd like to look at the
16 break at June 30th, 2007.
17      A    Uh-huh.
18      Q    Do you recall that being about the time
19 Ben Chui acquired Synergy Acceptance Corporation?
20      A    Yes, somewhere in that neighborhood. I
21 think it was early July, but yes.
22      Q    And this list, total profit for
23 January 1st, 2007 through June 30th, 2007, it gave us
24 1.257 million and change; correct?
25      A    It looks that way.

J. TORCHIA

1
2       Q    And it looks like a total number of loans
3 sold were almost 2600?
4       A    Okay.
5       Q    Does that correspond with your memory of
6 what type of volume of business you were doing with
7 APAL at that point in time?
8       A    I just don't remember. Again, Kim Kruse.
9       Q    And this 484 number, would you think that
10 it included the GAP waiver coverage and warranty
11 expense or warranty fee?
12      A    Seems low.
13      Q    And, again, the profit on there --
14      A    It looks like Ben owes me money,
15 actually.
16      Q    And this average profit per loan here you
17 would think refers to -- I believe we discussed
18 earlier -- gross profits?
19      A    Yes, I believe.
20      Q    So it wouldn't account for Synergy
21 Acceptance Corporation's other operating expenses?
22      A    No, that wasn't after Synergy broke down
23 the cost of each originating loans, no. That was
24 gross profits. We're not smart enough to do that
25 loan by loan.

J. TORCHIA

1
2       Q    During the 2005, 2006 time frame when
3 you're selling what appears to be a decent number of
4 loans to American Pegasus Loan Fund, was Synergy
5 Acceptance profitable at the end of the day?
6       A    Was Synergy Acceptance Corp. -- what was
7 the -- what were the time parameters again?
8       Q    The 2005, 2006 period.
9       A    I mean without a balance sheet in front
10 of me --
11          (Torchia Deposition Exhibit No. 79
12          was marked for the record.)
13 BY MR. PALMER:
14      Q    Mr. Torchia, this is Exhibit 79. Do you
15 recognize this document?
16      A    I mean, I know what it is, yes. I guess
17 so.
18      Q    What is it?
19      A    It's a balance sheet and audited
20 financials, it looks like, or an auditor's report.
21      Q    And if you look on the first page, this
22 is for Synergy Acceptance Corporation; correct?
23      A    Yes.
24      Q    Do you recall having Synergy Acceptances
25 financials audited?

J. TORCHIA

1
2       A    I do.
3       Q    And this -- this accounting firm at the
4 bottom, Stresser & Associates, PC, is that who would
5 have done it?
6       A    Yes.
7       Q    Why did you have SAC's financials
8 audited?
9       A    It might have been for one of our
10 securities that we were offering, possibly.
11      Q    So for those noteholders or investors, if
12 it was something that was required?
13      A    I think so. I just can't remember.
14      Q    And would you have seen these when they
15 were done?
16      A    Yes, probably.
17      Q    As one of the -- as the CEO, would you
18 have followed sort of the balance sheet and income
19 statement of the company over time?
20      A    Yes, from a real high perch. Again, that
21 would be Kim Kruse and my accountants and that kind
22 of stuff.
23      Q    So they would put it together; correct?
24      A    Yes, the accountants would. And this
25 would probably come from -- all the information would

Case: 12-03156   Doc# 211   Filed: 04/17/14   Entered: 04/17/14 18:34:24   Page 22 of 22